**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**SALVADOR PEREZ, # 358409P**                    **CIVIL ACTION**

**VERSUS**                                        **NO. 04-1905**

**BURL CAIN, WARDEN**                             **SECTION "C"**
**LOUISIANA PENITENTIARY**

## ORDER AND REASONS

Now before the Court is a petition for habeas corpus relief by Mr. Salvador Perez

(hereafter "Petitioner"), pursuant to 28 U.S.C. § 2254.  Petitioner seeks relief from a March 14,

1998 conviction of first degree murder of a police officer and sentence of life imprisonment

without the possibility of parole.  As grounds for relief, Petitioner claims that his due process

and fair trial rights were violated because (1) there was insufficient evidence to rebut his defense

of legal insanity; (2) there was insufficient evidence to support his conviction of first degree

murder of a police officer; (3) the state withheld material evidence supporting his insanity

defense; (4) the trial court commented on the evidence and/or gave erroneous jury instructions;

(5) the trial court refused to allow the jury to view written reports by experts or, in the

alternative, failed to declare a mistrial when the state made false statements concerning those

records; (6) he received ineffective assistance of counsel; (7) the trial court erroneously admitted

1

certain evidence and testimony; (8) the trial court failed to provide a proper English-Spanish translation of his trial; and (9) he was not mentally competent at the time of the trial.[1]

After a thorough review of the record, memoranda, and applicable law, the Court finds that the state courts unreasonably applied established Supreme Court precedent in denying Petitioner relief on his claims relating to the sufficiency of the evidence as to the insanity defense, *Brady* violations, and ineffective assistance of counsel.  For the reasons set forth more fully below, this Court finds that Petitioner's due process rights under the United States Constitution were violated when he was convicted despite having proven, by a preponderance of the evidence, that he was insane at the time of the incident; when the state withheld material evidence in violation of *Brady v. Maryland;* and, when his counsel rendered ineffective assistance of counsel by failing to object to unnecessary and prejudicial evidence, thereby permitting his trial to occur under highly prejudicial circumstances.   Accordingly, the petition is GRANTED and Petitioner's sentence is hereby VACATED.

## I.      BACKGROUND & PROCEDURAL HISTORY

 Petitioner was convicted of first degree murder on March 14, 1998 for the July 17, 1996 shooting and killing of New Orleans' Police Officer Chris McCormick.  At the time of the incident, Petitioner was a citizen of Mexico legally residing in Texas with his wife and five children.  The facts giving rise to the shooting and Petitioner's subsequent conviction follow.

---

[1] The petition for habeas corpus and supporting memorandum as well as the state's response brief discuss Petitioner's claims in a slightly different order.  Due to the overlap between Petitioner's claims, namely his two assertions of insufficient evidence and the interplay between trial counsel's failure to object to some prejudicial evidence and the trial court's failure to exclude other prejudicial evidence, this Court addresses the issues in the order set forth herein.

On July 17, 1996 Byron Polite, a supervisor of security at the New Orleans Fair Grounds'

race track, received a call from a nearby resident that a man and his child were staying in barn

twenty-six.  In response to the phone call, Polite drove in his golf cart to barn twenty-six where

he encountered Petitioner and his twelve-year old son.[2]  At Polite's approach, Petitioner pulled

his son close to him, drew out a gun, and told Polite, apparently in English, that Polite was not

going to take his son and should leave them alone.[3]  Polite then retreated and called the police.

Police officers later found Petitioner's son alone near Petitioner's van and took the boy

into custody.[4]  New Orleans Police Lieutenant Arden Taylor spoke with Petitioner's son to

determine the circumstances which led Petitioner and his son to the New Orleans Fair Grounds.

While speaking with Lt. Taylor, Petitioner's son indicated that he and Petitioner were from

Texas and were in New Orleans because Petitioner, believing that he was being pursued by

various persons, including potential drug dealers, had driven himself and his son there to get

away from his pursuers.  Petitioner's son did not know precisely who the people supposedly

pursuing Petitioner were, but indicated his belief that Petitioner had refused to go into business

with some drug dealers and that Petitioner believed the drug dealers were following him and his

son.  With drugs potentially involved, Lt. Taylor brought a canine unit in to sweep the vehicle

for narcotics.  Despite finding no evidence of drugs, the vehicle was impounded.  A later

inventory of the van yielded two 3x5 inch memo pads, a note pad, a "Berger Field tool rental," a

roadmap of the United States, a receipt for $450.00, a pair of binoculars, a Wal-Mart receipt

---

[2] Rec. Vol. V, Trial Transcript, pgs. 20-21.

[3] Officer Polite did not recall the exact words Petitioner used, but indicated at trial that he understood that Mr. Perez wanted to be left alone and said something along the lines of "You're not going to take my kid." *Id*. at 21, 24-25.

[4] From the record, it is unclear precisely why Petitioner's son was alone, but Dr. Rafael Salcedo testified that he understood that Petitioner had left his son there while Petitioner went out to look for another vehicle. *Id.* at 173.

dated July 13, 1996 from Seguin, Texas, and an ice chest containing matter that appeared to be decayed food.

Around 10:30 p.m. on July 17, Debbie Mastio, the occupant of the upper part of 1437 Leda Court, discovered that she was not getting any hot water and went to her hot water shed to find out why.  Ms. Mastio testified that she was descending the backstairs, when she saw a man, whom she later identified as Petitioner, hiding in her shed holding a "shiny, metallic object." Upon seeing Petitioner, Ms. Mastio ran back upstairs, locked the door, and told Dr. Elliott Black, a visiting friend, what had happened.[5]  Dr. Black then went out back to investigate and, according to his testimony, saw Petitioner in Ms. Mastio's watershed holding a gun and pointing it at Dr. Black.[6]  After retreating back into Ms. Mastio's house, Dr. Black and Ms. Mastio called the police.

New Orleans Police Officers Chris McCormick and Artie Jackson responded to Ms. Mastio's call and arrived on the scene sometime before midnight.  According to Officer Jackson's testimony, both officers were in uniform, but the patrol car did not have its sirens on or its overhead lights flashing when they approached Ms. Mastio's house.[7]  After arriving, Officers McCormick and Jackson were taken through the house to the back stairs.  On the stand, Officer Jackson did not recall exchanging any particular words with Dr. Black; Dr. Black testified only that he told the officers "[h]e's right down here. This is very dangerous."[8]   Officer McCormick proceeded down the stairs first, with Officer Jackson behind him near the top of the stairs.  Officer Jackson testified that Officer McCormick was shot once upon reaching the last

---

[5] Rec. Vol. V, Trial Transcript, pgs. 50-51.

[6] *Id*. at 65.

[7] *Id*. at 76.

[8] *Id*. at 65.

stair.  After seeing Officer McCormick fall backwards, clutching his chest, Officer Jackson

grabbed his radio and called for help.[9]  Officer Jackson indicated that the yard was very dark in

certain areas and that it was too dark for Officer Jackson to return any fire.[10]

      While Officer Jackson was waiting for more officers to arrive, Petitioner apparently fled

the scene.  A search of the area was initiated and four canine units were called in to locate

Petitioner.  Petitioner was found underneath a nearby residence by Max, Officer Harold

Chambliss's dog.  Officer Chambliss ordered Max under the house and two shots rang out,

striking Max, who retreated.  Max was sent back under and Chambliss ordered Petitioner, in

English, to come out.  After Petitioner failed to respond, Officer Chambliss fired two shots,

striking Petitioner twice and disabling him.  Other officers retrieved Petitioner from under the

house.  Petitioner was taken to the Medical Center of Louisiana to receive treatment for his

wounds, before being taken into custody.  A drug test taken at the hospital returned no traces of

narcotics or alcohol in Petitioner's blood.

      Prior to going to trial, Petitioner's attorney claimed that Petitioner was incompetent and

sought the appointment of a sanity commission to determine Petitioner's competency.  Dr.

Rafael Salcedo and Dr. Sara DeLand were appointed to evaluate Petitioner and testified that he

was competent to proceed to trial at a lunacy hearing held on January 30, 1997.[11]  Based on this

testimony, the trial court found Petitioner competent to proceed.  Petitioner's attorney again

raised the issue of competency and following three additional lunacy hearings, the trial court

found Perez dangerous to himself and others and remanded him to the Feliciana Forensic

Facility.  At Feliciana, Dr. David Carrington evaluated Petitioner, determined that he was

---

[9] *Id*. at 70-71.

[10] *Id*. at 75-76.

[11] *Id.* at 231.

psychotic, and began treating Petitioner with the anti-psychotic medicine Haldol.[12]  Dr. Carrington indicated that Petitioner responded positively to Haldol, and after further evaluation and another lunacy hearing, Petitioner was found competent to proceed to trial.[13]

At Petitioner's trial, defense counsel conceded in opening statement that Petitioner shot and killed Officer McCormick on July 17, 1996.  The primary issue in dispute was, therefore, Petitioner's sanity at the time of the incident.  The state's case consisted of the testimony of numerous New Orleans Police Officers.[14]  The 911 tape of Officer Jackson requesting help was played at the end of the state's direct examination of Officer Jackson and again during closing arguments.[15]  In addition to the police officers, the state called Debbie Mastio and Doctor Elliot Black who testified to the events bringing Officers Jackson and McCormick into contact with Petitioner; Doctor Myron Smith, a veterinarian who testified about the wounds Max, the canine dog, suffered; Doctor William Newman, a pathologist who performed the autopsy on Officer McCormick and testified that the cause of death was a single gunshot wound to the chest; and Danine McCormick, the slain officer's widow.  The state called no doctors or psychologists to rebut the defense evidence of insanity.  In fact, none of the state's witnesses testified that they had extended contact with Petitioner and none of them indicated that they had any experience dealing with or diagnosing persons suffering from mental illness.

Having conceded that Petitioner shot Officer McCormick, Petitioner's defense consisted of testimony from seven expert witnesses who had examined Petitioner for mental illness, Petitioner's wife, Rosa Perez, and Petitioner's son, Jose Perez.  Petitioner's wife and son

---

[12] *Id.* at 217-18.

[13] *Id.* at 221-27.

[14] Fourth Circuit Opinion, *State v. Perez*, 98-KA-1407, November 3, 1999. For a comprehensive statement of the testimony offered by each witness at trial, see pgs. 2-19 of opinion.

[15] Rec. Vol. V, Trial Transcript, p. 72.

testified that Petitioner had been behaving oddly for a few weeks prior to July 15, 2006. Specifically, they indicated that he had been acting paranoid, whispering, and acting very secretive as though people were watching him.[16]  Petitioner's wife and son also testified that Petitioner left Texas with his son because he believed that various persons from Texas were following him and that he was on his way to Florida, where Petitioner and his family used to reside, when he stopped in New Orleans.[17]  Petitioner's son stated that Petitioner exhibited paranoid behavior throughout the trip, including refusing to stop for food, pushing buttons on the roof of the car in an attempt to lose people supposedly following them, varying his speed to lose his pursuers, and having shaking hands.[18]  Petitioner's son admitted during his testimony that he had told police officers that Petitioner believed he was fleeing from  rebuffed drug dealers, but went on to say that he had not actually believed that Petitioner was being pursued by rebuffed drug dealers or any other persons from Texas.[19] Other than statements indicating that Petitioner feared that drug dealers were pursuing him, no evidence linking Petitioner to drugs or drug dealers was ever found or presented to the jury.

To rebut the testimony of Petitioner's wife and son, the state called Detective Joseph Catalanotto who stated that when he asked Mrs. Perez in July 1996 whether her husband had any psychological problems, she replied "[n]o, not that I know of."[20]  Detective Catalanotto further

---

[16] *Id.* at 239.

[17] *Id.* at 240, 246, 248-50, 270-71.

[18] *Id.* at 249-251.

[19] *Id.* at 256-58.

[20] While this statement is arguably inconsistent with her later saying that he was acting strangely, there is no contention that it is factually incorrect.  The record indicates that Petitioner had never been diagnosed as mentally ill prior to the incident.  Nor would Petitioner's wife necessarily have been able to diagnose Petitioner as mentally ill in this case.  As Dr. Carlos Kronberger, among others,  indicated that these types of disorders may be hard for laymen to diagnose because a mentally ill individual will act strangely but not as overtly psychotic as one might assume. *Id.* at 273.  Dr. Jose Pena also testified that Petitioner's wife "knew he was suspicious, but she really wasn't sure what
(continued...)

7

stated that Petitioner's son had indicated that Petitioner rejected his step-father's offer to engage in some kind of narcotics business.  He did not indicate whether this actually resulted in Petitioner's relatives or other persons following Petitioner or whether Petitioner's boy felt threatened by any relatives or other persons in Texas.

In addition to Petitioner's wife and son, Petitioner offered the testimony of seven psychiatrists and psychologists who had examined Petitioner at various points after the shooting. **Six of Petitioner's mental health experts testified that they had evaluated Petitioner and that it was their expert opinion that Petitioner had been insane and incapable of distinguishing between right and wrong at the time of the incident.**[21]  They also testified that they had personally evaluated Petitioner,[22] that they had considered the possibility that Petitioner might be malingering, and that they had expressly ruled out such possibility.[23]  In addition, the seventh expert, Dr. Carrington, the state-employed doctor working at Feliciana who was charged with restoring Petitioner to competency, testified that Petitioner exhibited psychotic behavior upon his arrival at Feliciana and that he was prescribed Haldol, an anti-psychotic medication.[24] Dr. Carrington was not asked and did not indicate whether he believed that Petitioner was

---

[20](...continued)
was going on" and that this is "much more consistent with the kind of history you would hear by a concerned loved one when they see a change in somebody that's close to them."*Id.* at 187.

[21] Rec. Vol. 5, Trial Transcript, pgs. 137-38, 40 (Dr. Kenneth Ritter); pgs. 170-71 (Dr. Raphael Salcedo); pgs. 184, 187 (Dr. Jose  Pena); pgs. 172, 202 (Dr. Victoria Urrutia); pgs. 230, 233 (Dr. Sarah  DeLand); p. 267 (Dr. Carlos Kronberger).

[22]See Rec. Vol. V, Trial Transcript, pgs. 136, 142, 202 (Dr. Ritter); pgs. 161, 163 (Dr. Salcedo); p. 183 (Dr. Pena); p. 196 (Dr. Urrutia); pgs. 213-14, 217 (Dr. DavidCarrington testifying that Petitioner was under constant supervision and that he met with Petitioner two times weekly for several months); p. 230 (Dr. DeLand); pgs. 264, 278, 280 (Dr. Kronberger stating that he "interviewed him exhaustively" and primarily based his diagnosis on his personal observations of Petitioner).

[23] Rec. Vol. V, Trial Transcript, p. 138 (Dr. Ritter); pgs. 185-87 (Dr. Pena); pgs. 200-01 (Dr. Urrutia); pgs. 219-20 (Dr. Carrington); pgs. 232-33 (Dr. DeLand); Testimony of Dr. Kronberger, pgs. 266-07.

[24] *Id.* at 217-20.

incapable of distinguishing between right and wrong at the time of the offense, but he stated that Petitioner was mentally ill and that he did not believe Petitioner was malingering.

The state did not call a single expert witness or present lay testimony directly addressing Petitioner's mental state around the time of the incident.  Petitioner's trial before a 12-person jury took place on March 11-14, 1998.  After the jury found Petitioner guilty of first degree murder, the jury unanimously recommended life imprisonment in the penalty phase.  Petitioner sought a judgment of acquittal or a new trial following the verdict, which was denied March 27, 1998.  Waiving legal delays, Petitioner was sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence.  A notice of appeal was filed on the date of sentencing.

On appeal, Petitioner argued that there was insufficient evidence to support the jury's verdict and that Petitioner's counsel was not qualified to represent him because one of his attorneys was a third-year law student.  The Louisiana Fourth Circuit Court of Appeal affirmed Petitioner's conviction and sentence,[25] and the Louisiana Supreme Court denied writs.[26]

Petitioner filed his application for post-conviction relief on September 20, 2001,[27] in which he claimed that his right to due process was denied by the jury convicting him despite evidence of insanity; the judge giving erroneous jury instructions regarding specific intent with regard to the  requisite intent to harm a police officer; the judge erroneously excluding evidence in the form of expert reports; his trial and appellate counsel providing ineffective assistance; the trial court's failing to provide translation of the trial; the trial court's erroneously admitting prejudicial evidence; the prosecution withholding material evidence in violation of *Brady v.*

---

[25] *State v. Perez*, 745 So.2d 166, 188 (La. App. 4 Cir. 1999).

[26] Rec. Vol. V, Writ Denied, *State v. Perez*, 1999-K-3372, September 22, 2000.

[27] Rec. Vol. VI, Application for Post-Conviction Relief, *Perez v. Cain*, No. 385-086, Section "A".

*Maryland*; the court affirming his conviction based on an incomplete record; the court erroneously finding him competent; violation of his rights against double jeopardy; and violation of his confrontation rights.  His application was denied by the state district court, after an evidentiary hearing, on January 28, 2003.[28] After denial by the Fourth Circuit Court of Appeal, the Louisiana Supreme Court denied writs on July 2, 2004.[29]  Petitioner filed this federal application for habeas corpus on July 6, 2004.[30]


## II.     JURISDICTION

Jurisdiction is proper under the Antiterrorism and Effective Death Penalty Act (AEDPA) if the petitioner is "in custody" under the conviction he is attacking.[31] Petitioner is confined at the Louisiana State Penitentiary in Angola, therefore jurisdiction is proper.


## III.    VENUE

Venue is proper under AEDPA in the district where the inmate is in custody or where the state court conviction and sentence were obtained.[32] Petitioner was convicted and sentenced in Orleans Parish, therefore venue in the Eastern District of Louisiana is proper.


## IV.    TIMELINESS

---

[28] Rec. Vol. VI, Transcript of Post Conviction Hearing, *State v. Perez*, No. 385-086, January 28, 2003.

[29] Rec. Vol. VII, *State v. Perez*, 2003-KP-2814, July 2, 2004.

[30] Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus, *Perez  v. Cain*, No. 04-1905.

[31] 28 U.S.C. § 2241(c)(3); 28 U.S.C. § 2254(a).

[32] 28 U.S.C. § 2241(d).

The state submits that the petition is timely, and after reviewing the record this Court agrees. Generally speaking, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires that a petitioner bring his Section 2254 claims within one year of the date on which his conviction became final.[33]  Pursuant to 28 U.S.C. § 2244(d)(1)(A), Petitioner's one-year limitation period for seeking federal habeas corpus relief commenced running on the date the judgment "became final by the conclusion of direct review or the expiration of the time for seeking such review."  Petitioner's direct appeal was denied by the Supreme Court of Louisiana on September 22, 2000 and he did not appeal to the United States Court Supreme Court. Petitioner's conviction became final ninety days after the Supreme Court of Louisiana denied his application for supervisory writs, on December 21, 2000.

On this date, the one-year statute of limitations for filing a federal habeas corpus petition began to run.[34]  However, AEDPA's one-year statute of limitations is tolled for the period during which a properly filed application for post state conviction relief or other collateral review attacking a conviction or sentence is pending in state court.[35]  A total of 273 days passed from December 21, 2000 until September 20, 2001, when Petitioner filed his motion for post conviction relief.[36]  The statute of limitations was tolled while Petitioner's application for state post-conviction relief was pending in the state courts. The Louisiana Supreme Court denied writs on Petitioner's post-conviction relief on July 2, 2004.[37]  Petitioner filed the instant petition on

---

[33] 28 U.S.C. § 2244(d).

[34] See *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003); *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999).

[35] See *Fields v. Johnson*, 159 F.3d 914 (5th Cir. 1998); 28 U.S.C. § 2244(d)(2).

[36] Rec. Vol. VI, Application for Post-Conviction Relief, *Perez v. Cain*, No. 385-086, Section A.

[37] Rec. Vol. VII, *State v. Perez*, 2003-KP-2814, July 2, 2004.

July 6, 2004.  Allowing tolling for the period during which Petitioner's state applications were pending, a total of 277 days lapsed, which is within the statute of limitations.

For the reasons stated above, the Court finds the petition for a writ of habeas corpus now before the Court timely.

## V.    EXHAUSTION

Petitioner has exhausted available state remedies as required by AEDPA.  Under AEDPA, a petitioner must first exhaust his remedies in state court before seeking habeas relief from the federal courts.[38]  "To exhaust, a petitioner must have fairly presented the substance of his claim to the state courts."[39]  Generally, the exhaustion requirement is satisfied only when the grounds urged in a federal habeas petition were previously presented to the state's highest court in a procedurally proper manner according to state court rules.[40]

Petitioner presents nine claims for review in his federal habeas petition as listed above.  Each of these claims was raised in his application for writs of certiorari and review to the Louisiana Supreme Court on direct appeal and/or in his application for post conviction relief.[41]  Accordingly, Petitioner has satisfied AEDPA's exhaustion requirement.  Therefore, the Court addresses Petitioner's claims on the merits.

## VI.    STANDARD OF REVIEW

---

[38] 28 U.S.C. § 2254(b)(1)(A).

[39] *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (internal quotation marks omitted).

[40] *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988).

[41] Rec. Vol. V, Fourth Circuit Opinion, *State v. Perez*, 98-KA-1407, November 3, 1999; and State Rec. Vol. 7, Application for Writ of Certiorari, October 10, 2003.

AEDPA comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of fact and law.[42]  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).[43]  As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[44]  The United States Supreme Court has noted the following:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams v. Taylor*, 529 U.S. 362 (2002) that an unreasonable application is different from an incorrect one.[45]

---

[42] 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[43] *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

[44] 28 U.S.C. § 2254(d)(1).

[45] *Bell v. Cone*, 535 U.S. 685, 694 (2002), internal citations omitted.

As to questions of fact, factual findings are presumed to be correct, and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[46]

## VII.    LAW & ANALYSIS

### (1) Sufficiency of the Evidence

In Petitioner's first and second assignments of error, Petitioner alleges that the evidence adduced at trial was insufficient to support a conviction for first degree murder of a police officer for two reasons.  Petitioner first argues that he was convicted despite proving, by a preponderance of the evidence, that he was insane at the time of the offense.  He goes on to claim that no reasonable jury could have concluded that he had the requisite knowledge or intent to harm a police officer engaged in the lawful administration of his duty.

In regards to Petitioner's first claim for relief, that Petitioner sufficiently proved that he was not guilty by reason of insanity at the time of the offense, Petitioner asserts the same insufficiency arguments that he first raised on direct appeal in state court.  Specifically, Petitioner claims that the jury acted unreasonably in finding him sane when six mental health experts testified at trial that he was insane at the time of the shooting, lay testimony corroborated their opinions, and the state presented no expert or lay testimony on the issue of Perez's sanity. The state claims that it vigorously rebutted the defense by demonstrating that the medical experts were mistaken as to Perez's mental condition at the time of the offense because they did not evaluate him until significantly later; that the factual basis for the medical experts' testimony, derived primarily from later self-serving interviews with Perez, his wife, and his son, was

---

[46] 28 U.S.C. § 2254(d)(2); *see also Hill v. Johnson*, 210 F.3d 481, 485; 28 U.S.C. § 2254(e)(1).

unreliable; and that Perez's actions before and after the shooting demonstrated he was not insane.

The Louisiana Fourth Circuit Court of Appeal considered Petitioner's arguments and found that the factual scenario forming the basis of "[a]ll of the physicians" was sufficiently called into doubt to undermine the testimony of the experts.[47]  In addition, the Fourth Circuit found that Petitioner's fears that people were following him or intended to harm him or his family may not have been delusions given Petitioner's son's statements to police officers that Petitioner had spurned drug dealers.[48]  In fact, the Fourth Circuit's decision found all of Petitioner's behavior "consistent with a man fleeing rebuffed drug dealers."[49]

The Louisiana Supreme Court upheld the Fourth Circuit's decision without opinion. Petitioner reiterated his insufficiency arguments in his application for post-conviction relief. Although Petitioner was granted an evidentiary hearing in response to his application, the hearing judge rejected Petitioner's arguments, refused to hear further expert testimony regarding Petitioner's sanity, and refused to overturn the jury in their verdict.[50]  The Louisiana Supreme Court summarily upheld the hearing judge's decision and denied Petitioner's application for post-conviction relief on July 2, 2004.[51]  Having reviewed the record and relevant law, this Court finds that the state court's denial of relief on this claim was an unreasonable application of clearly established Supreme Court precedent as Petitioner sufficiently proved that he was insane at the time of the offense such that no reasonable jury could have found otherwise.

_____

[47] *State v. Perez*, 98-KA-1407, November 3, 1999, p. 31.  Specifically, the Fourth Circuit held that:

> All of the physicians who testified that Perez did not know right from wrong based their opinions, in significant part, on information obtained from Perez's wife and son concerning his behavior prior to the shooting of Officer McCormick.

[48] *Id.*

[49] *Id.* at 32.

[50] State Rec. Vol. VI, Transcript of Post Conviction Hearing, *State v. Perez*, No. 385-086, January 28, 2003, pgs. 28, 40-42, 45.

[51] *State v. Perez*, 877 So.2d 141, 2003-2814 (La. 7/2/2004).

A claim of insufficiency of the evidence is a mixed question of law and fact, requiring this Court to examine whether the state court's denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.[52]  The Supreme Court established the due process standard a reviewing court must utilize in analyzing the sufficiency of the evidence in *Jackson v. Virginia.*[53]  Pursuant to *Jackson* , the inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime, as identified by state substantive law,  to have been proven beyond a reasonable doubt.[54]

In regards to Petitioner's first claim of insufficient evidence, Louisiana law presumes the sanity of the defendant, placing the burden on the defendant to overcome this presumption with proof of insanity by a preponderance of the evidence.[55]  A defendant is not, however, required to establish insanity beyond a reasonable doubt.[56]  To be exempted from criminal responsibility on the basis of insanity, a defendant must persuade the jury that he had a mental disease or defect which rendered him incapable of distinguishing right from wrong at the time of the incident.[57] Applying the *Jackson* standard to the insanity defense under Louisiana law, the inquiry for a reviewing court is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude beyond a reasonable doubt that the defendant failed

---

[52] *Penry v. Johnson,* 215 F.3d 504, 507 (5th Cir. 2000); *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995).

[53] *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). See also *Guzman v. Lensing*, 934 F.2d 80, 82 (5th Cir. 1991).

[54] *Jackson v. Virginia*, 443 U.S. at 316-17, 99 S.Ct. at 2787-88, 61 L. Ed. 2d 560 (1979); *Donahue v. Cain*, 231 F.2d 1000, 1004 (5th Cir. 2000).

[55] La.Rev.Stat.ann 15:432.

[56] *State v. Stewart*, 117 So.2d 583 (La. 1960).

[57] La.Rev.Stat. 14:14

to prove by a preponderance of the evidence that he was insane at the time of the offense.[58] Under *Jackson*, a review of the sufficiency of the evidence does not include a review of the credibility of the witnesses.[59]  Instead, *Jackson* "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence and to draw *reasonable inferences* from basic facts to ultimate facts."[60] A jury's findings on an issue of fact will be upset only where necessary to preserve the "fundamental protection of due process of law."[61]

When an accused offers expert testimony on the issue of sanity and the state does not, such testimony might suffice to render a jury's determination of guilt unreasonable, but due process does not inherently necessitate such a finding.  There is "nothing essentially sacred or untouchable in expert testimony" and it is well-established that the state is not required to call expert witnesses to rebut the conclusions of a defendant's expert.[62]  "Expert testimony, particularly that of psychiatrists, may be rebutted by the personal opinions of laymen."[63] Nevertheless, "the opinions of experts may not be arbitrarily ignored," and there generally must exist some reason that is objectively present for ignoring expert opinion.[64]  Previous case law indicates that expert testimony may, for instance, be overcome in the following ways:

---

[58] See *Donahue v. Cain*, 231 F.3d 1000, 1004 (5th Cir. 2000)*; State v. Silman*, 663 So.2d 27, 32 (La. 1995); *State v. Peters*, 643 So. 2d 1222, 1225 (La. 1994); *State v. Nealy*, 450 So.2d 634, 637 (La. 1984).

[59] *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *United States v. Garcia,* 995 F.2d 556, 561 (5th Cir. 1993).

[60] *Jackson,* 443 U.S. at 319 (emphasis added).

[61] *Id.* at 319; *State v. Milton*, 2006 WL 2776247, 1 (La.App. 3 Cir. 2006).

[62] *Dusky v. United States*, 295 F.2d 743, 757 (8th Cir. 1961); *Brock v. United States*, 387 F.2d 254, 257 (5th Cir. 1967); *Mims v. United States*, 375 F.2d 135, 140-43 (5th Cir. 1967); *Breland v. United States*, 372 F.2d 629 (5th Cir. 1967); *Birdsell v. United States*, 346 F.2d 775 (5th Cir. 1965); *United States v. Cain*, 298 F.2d 934 (7th Cir. 1962); *State v. Parker*, 416 So.2d 545 (La. 1982); *State v. Ledet*, 692 So.2d 1309 (La. App. 3d Cir. 1997).

[63] *Brock v. United States*, 387 F.2d 254, 257 (5th Cir. 1967).

[64] *Brock*, 387 F.2d at 247 (5 th Cir. 1967); *United States v. Fortune*, 513 F.2d 883, 890 (5 th Cir. 1967), cert. denied, 423 U.S. 1020, 96 S.Ct. 459, 46 L.Ed.2d 393 (1975); *United States v. McCracken*, 488 F.2d 406, 412 (5 th Cir. 1974); *United States v. Harper*, 450 F.2d 1032, 1037 (5th Cir. 1971); *Mims v. United States*, 375 F.2d 135, 140-43 (5th Cir. 1967); *State v. Peters*, 643 So.2d 1222, (La. 1994).

> [B]y showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, 'the reasoning by which he progresses from his material to his conclusion,' the interest or bias of the expert, inconsistencies or contradictions in his testimony as to material matters, material variations between the experts themselves, and defendant's lack of co-operation with the expert...In some cases, the cross examination of the expert may be such as to justify the trier of facts in not being convinced by him.[65]

The determination of whether expert testimony sufficiently overcomes contrary lay testimony depends, of course, on the particular facts of the case.[66]  A careful review of the record in the instant case, however, reveals no objective reason for the jury to have entirely disregarded the opinion of Petitioner's seven experts.  The state in no way impinged upon the veracity, motives, or qualifications of any expert and there was nothing intrinsically unreliable about the experts' findings.  Looking first at the qualifications of Petitioner's experts, it is evident that they were qualified beyond dispute.[67]  Many of the experts were also disinterested as they were either appointed by the court or otherwise employed by the state.[68]  While the interests and qualifications of experts are not decisive in the context of a sufficiency of the evidence claim, they are important factors in determining whether the jury was acting reasonably in disregarding expert testimony.[69]

---

[65] *Mims v. United States*, 375 F.2d 135, 143-44 (5th Cir. 1967).

[66] *White v. Estelle*, 669 F.2d 973, 978 (5th Cir. 1982)(citing *United States v. Mota*, 598 F.2d 995 (5th Cir. 1979), cert. denied, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1979)).

[67] The state stipulated to the expertise of all of the psychiatrists who testified for Petitioner.  Moreover, some of the experts appear to have been eminently qualified. Dr. Kronberger, for instance, was awarded a diplomat in clinical psychology and established that he had extensive experience with severally mentally ill patients. Rec. Vol. V, Trial Transcript, p. 263.  Dr. Ritter's impressive credentials were previously recognized by the Louisiana Supreme Court, which found error when a court "disregarded the testimony of Dr. Ritter, a well respected forensic psychiatrist ... [who] has practiced forensic psychiatry in the New Orleans area since 1981 and is recognized in the state of Louisiana and neighboring states as an accomplished expert in this field." *State v. Silman*, 663 So.2d 27, 36, 95-0154 (La. 11/27/95).

[68] Dr. Ritter, Dr. Salcedo, and Dr. DeLand were appointed by the trial court to determine Petitioner's sanity. Rec. Vol. V, Trial Transcript, pgs. 137, 156, 230. Dr. Pena became involved in the case only after a state doctor contacted him for a consultation. *Id.* at 183. Dr. Carrington was employed by the state of Louisiana as a psychiatrist and was charged with diagnosing and restoring Petitioner to competency. *Id.* at 213-14.

[69] In *Wright v. United States*, 250 F.2d 4 (D.C. Cir. 1957), and *Bishop v. United States*, 394 F.2d 500 (5th Cir. 1968) the testimony of disinterested experts specifically appointed or employed by the state carried substantial weight

(continued...)

Beyond being highly-qualified and disinterested, Petitioner's experts were largely in agreement about Petitioner's condition and his sanity at the time of the incident.  Although the precise diagnosis offered by some of the experts differed slightly as some characterized Petitioner as schizophrenic while others stated that he was delusional, all of them described Petitioner as exhibiting the same basic symptoms, all of them indicated that he suffered from a persecutory psychotic disorder – identified as the umbrella diagnosis encompassing schizophrenia and delusional disorders by Dr. Kronberger – and all of them indicated that his disorder affected his ability to understand the implications of his actions.[70]  In order for expert evidence to be disregarded as conflicting, the discrepancies and variations between the experts' conclusions must be material.[71]  As indicated by Petitioner's experts, the fact that one expert characterized Petitioner as schizophrenic and another as delusional, is not a material discrepancy in a case such as this one.[72]  Dr. Kronberger noted, for instance, that Petitioner's psychotic disorder fell "under the umbrella of schizophrenia and other psychotic disorders"[73] and Dr.

---

[69](...continued)

against lay witness testimony and the state's attempts to undermine the experts' testimony merely through cross-examination. Similarly, in *Douglas v. U.S.,* 239 F.2d 52, 59 (D.C. Cir. 1956) the court indicated that a rational jury may not disregard the expert testimony of three disinterested psychiatrists when there is no opposing medical evidence, and the non-expert testimony arguably "cut both ways, at least as deeply in the direction of insanity as sanity."  See also *Fielding* 251 F.2d 881; *State v. Charles*, 643 So.2d 1222 (La. 1994) (finding defendant sufficiently established his insanity where both members of the sanity commission supported his claim, he was on medication for a long period of time before being restored to competency, and the state presented no expert testimony to rebut his claim).

[70] Rec. Vol. V, Trial Transcript, pgs. 267 (Dr. Kronberger's diagnosis was delusional disorder persecutory type); *Id.* at 230 (Dr. Deland's diagnosis was psychotic disorder similar to schizophrenia which is characterized by paranoia and delusions); *Id*. 137-38 (Dr. Ritter's diagnosis was chronic paranoid schizophrenia characterized by disorganized thinking and persecutorial delusions); *Id*. at 197 (Dr. Urrutia's diagnosis was delusional disorder, persecutory type with disorganized thinking); *Id*. at 217-20 (Dr. Carrington indicated that Petitioner suffered from psychotic-type disorder which involved very disorganized thinking and that he responded well to the anti-psychotic medicine Haldol).

[71] *Bishop*, 394 F.2d 500, 501 (5th Cir. 1968) (citing *Mims v. United States*, 375 F.2d 135, 144 (5th Cir. 1967))

[72] *See Satterwhite v. United States,* 267 F.2d 675 (D.C. Cir. 1959) (finding a diagnosis of schizophrenic reaction of the paranoid type versus a diagnosis of emotionally unstable personality disorder insufficiently relevant in the absence of government evidence indicating sanity or establishing significance of difference).

[73] Rec. Vol. V, Trial Transcript, p. 267.

Urrutia explained that Petitioner's doctors were "on the same track" despite having slightly

differing opinions.[74]  Thus, the differing diagnoses are not sufficiently material to overshadow

the clear consensus that Petitioner was insane and incapable of differentiating between right and

wrong at the time of the incident.

      As to any incompatibilities within an expert's report, Dr. Salcedo and Dr. DeLand were

the only experts whose reports contained potential discrepancies related to Petitioner's diagnosis.

Dr. Salcedo and Dr. DeLand were appointed to determine Petitioner's competency, and finding

Petitioner unresponsive and vague, they initially concluded that he was competent and probably

malingering.  His competency continued to be at issue, and upon further examination, they

determined that Petitioner's initial lack of cooperation was, in fact, endemic of a paranoid

condition.[75]  Dr. DeLand indicated, for instance, that doctors may have some initial difficulty

diagnosing paranoid disorders, but that this does not mean that the person was malingering.

Thus, while their opinion as to his sanity and competency changed after more thorough

investigation, according to their testimony, an altered diagnosis in a case such as this is neither

unexpected nor extraordinary.  As such, the earlier incongruous reports do not undermine Dr.

Salcedo and Dr. Deland's unequivocal ultimate determination that Petitioner was insane and not

malingering.[76]  More significantly, in the absence of evidence to the contrary or inconsistencies

in any of the reports by the five other experts, the earlier reports by Dr. DeLand and Dr. Salcedo

---

[74] *Id.* at 204-05.

[75] Dr. DeLand, for instance, stated that she initially believed he was competent because "he gave minimal answers to questions and answered "I don't know" and "I don't remember" to a lot of questions...And he did not talk a whole lot." Dr. Salcedo likewise stated that his first impression was that Petitioner was malingering because his initial responses were "guarded and vague." Rec. Vol. V, Trial Transcript, pgs. 231, 159.  As Dr. DeLand went on to say, however, Petitioner's behavior during the first meeting was, in fact, very consistent with his eventual diagnosis and that "[i]t's not unusual for very paranoid patients at the beginning, the first meeting with somebody, even a few meetings with them, to deny any of their paranoid delusions.  Especially if they have beliefs that there's a conspiracy ... [s]o it's not unusual for people to not be very willing at first to open up about that because they're frightened." Dr. DeLand also indicated that his reluctance to answer could have been a reaction to the intimidating circumstances surrounding his initial evaluation. *Id.* at 231-32.

[76] *Id.* at 170, 232-33.

20

are not sufficiently "material" to justify the jury in disregarding the testimony of all seven mental health experts.

In addition to the state courts insufficient consideration of the qualifications of the experts, the record also does not substantiate the state court's conclusion that the testimony of Petitioner's experts was reasonably undermined by doubts about the factual basis upon which the experts based their diagnoses or by the existence of facts or circumstances demonstrating Petitioner's sanity. Looking first at the information forming the basis for each expert's opinion, it is evident that even if the jury harbored doubts about the version of events espoused by Petitioner and his family, the jury would still not be justified in wholly disregarding the opinion of each and every expert who testified at Petitioner's trial. Several of the experts testified that they based their opinion on many sources of information and on their personal evaluation of Petitioner's behavior. For instance, Dr. Urrutia and Dr. Kronberger stated that they did not rely upon or have knowledge of other expert opinions prior to meeting Petitioner,[77] Dr. Salcedo, Dr. Urrutia, and Dr. Pena stated that they reviewed the entire record, including copies of the arrest report and witness testimony, in making their diagnosis,[78] and Dr. Kronberger made it clear that his evaluation of Petitioner's behavior and actions formed the primary basis of his diagnosis.[79] Lastly, all of the experts testified that they had specifically considered and ruled out the possibility that Petitioner was faking his illness.[80] Given such testimony, it is evident that the

---

[77] *Id.* at 196, 266.

[78] *Id.* at 165, 190, 195.

[79] Dr. Kronberger specifically stated that his determination was based on Petitioner's "behavior in the here and now" and that the "details of the family, what they reported, they really just added a little bit of flavor to the whole thing." He also unequivocally indicated that the majority of his opinion came from his examination of Petitioner. *Id.* at 278, 280.

[80] *Id.* at 136, 142, 202 (Dr. Ritter); *Id.* at 161, 163 (Dr. Salcedo); *Id.* at 183 (Dr. Pena); *Id.* at 196 (Dr. Urrutia); *Id.* at 213-14, 217 (Dr. Carrington testifying that Petitioner was under constant supervision and that he met with Petitioner two times weekly for several months); *Id.* at 230 (Dr. DeLand); *Id.* at 264, 278, 280 (Dr. Kronberger stating that he "interviewed him exhaustively" and primarily based his diagnosis on his personal observations of Petitioner).

reliability of all of the experts did not hinge on and, therefore, could not be impugned by simply undermining the veracity of Petitioner and his family.[81]  This is especially true where, as here, the experts' credentials and interests remained untainted.

As to the notion that the expert opinion in this case was undermined by the state demonstrating a lack of knowledge of Petitioner's behavior on the part of the experts, this Court first notes that the record demonstrates that Petitioner's experts had knowledge of Petitioner's overall actions and that they found his behavior entirely consistent with someone suffering from paranoid delusions.[82]  Even assuming that some of Petitioner's specific actions were not known by a particular expert, in order for an expert's opinion to be discredited on the basis of unknown facts, the facts in question must be "material."[83]  There is no indication in the instant case that any unknown facts were "material" as knowledge of the unknown acts would not apparently have altered any expert's opinion.[84]

Finally, the record does not support the state court's conclusion that Petitioner's actions, known or unknown to the experts, sufficiently demonstrated that he was sane at the time of the incident in light of the overwhelming evidence establishing otherwise.  As mentioned, expert

---

[81] See *Bishop v. United States*, 394 F.2d 500 (5th Cir. 1968)(holding that the government failed to rebut Petitioner's evidence of insanity despite the defendant's questionable credibility, where the defendant presented expert testimony that did not depend on the truth of narrative statements made by the defendant and the government offered no contrary medical evidence).

[82] Rec. Vol. V, Trial Transcript, pgs. 138, 140-41, 147 (Dr. Ritter); *Id.* at 201 (Dr. Urrutia); *Id.* at 218-220 (Dr. Carrington); *Id.* at 232 (Dr. DeLand); *Id.* at 270-71, 276-78 (Dr. Kronberger).

[83] See *Bishop v. United States*, 394 F.2d 500 (5th Cir. 1968)(holding that the government failed to rebut Petitioner's evidence of insanity despite showing a lack of knowledge by the experts of an utterance made by the defendant shortly after the incident, where defendant presented expert testimony that did not depend on the truth of narrative statements made by the defendant and the government offered no contrary medical evidence).

[84] The state's brief makes much of evidence indicating that Petitioner may have taken time to get provisions for the road trip, but several of Petitioner's experts stated that such that basic travel arrangements, such as getting a map, food, or gas would not have been uncharacteristic for someone suffering from delusions and that knowledge of such acts did not change the opinion of the experts.  Rec. Vol. V, p. 147 (Dr. Ritter); *Id.* at 173 (Dr. Salcedo); *Id.* at 191 (Dr. Pena); *Id.* at 198-202 (Dr. Urrutia).  The state also argued that Petitioner leaving his son at the vehicle was inconsistent with his alleged delusional disorder.  However, Dr. Salcedo and Dr. Kronberger indicated that Petitioner leaving his son at the vehicle was not inconsistent. *Id.* at 173. In addition, the state indicated that his encounter with Officer Polite explained his actions, but several of Petitioner's experts indicated that the encounter with Officer Polite was indicative of mental illness. *Id.* at 243-46, 780-81.

testimony set out that Petitioner's actions, as described by witnesses in police and hospital records, were consistent with Petitioner suffering from paranoid delusions.  In contrast to the testimony offered by Petitioner's experts, the state failed to present any evidence that Petitioner's actions were inconsistent with him being mentally ill or, alternatively, indicative of sanity.  The state's  witnesses did little more than document Petitioner's actions, which were ambiguous at best as to Petitioner's sanity at the time of the offense.[85]  A recitation by lay witnesses that a defendant was able to perform certain actions or that he seemed normal has previously been found insufficient in the face of expert testimony establishing otherwise.[86]  This is especially so where the witness had only brief contact with the accused and/or limited experience dealing with mental illness.[87] As the Louisiana Supreme Court indicated in *State v. Roy*, for instance, a "defendant's flight from the scene of the killing and his submission to the police when his car stopped ... [were] not inconsistent with a state of insanity, and could not by any rational fact finder be said to overcome the overwhelming evidence of insanity."[88]  Likewise, in *United States v. Cooper*, the Ninth Circuit found the government's evidence of sanity

---

[85] Compare *State v. Peters*, 643 So.2d at 1226 (noting that the circumstances of a shooting itself were neutral on the issue of sanity and, therefore, insufficient to rebut expert testimony establishing insanity despite Petitioner shooting only his estranged wife, lighting a cigarette, smiling and riding his bicycle away from the scene).

[86] *United States v. Collier,* 453 F.2d 1173 (5th Cir. 1972)(finding testimony of ten lay witnesses insufficient to rebut the testimony of seven psychiatrists who concluded defendant was insane)*; Brock*, 387 F.2d at 247 (5th Cir. 1967)(noting that "there is less force to a statement that nothing abnormal was observed than to a clinically based assertion of insanity"); *Wright v. United States*, 250 F.2d 4, 10 (D.C. Cir. 1957); *Fielding v. United States*, 251 F.2d 878 (D.C. Cir. 1957); *State v. Armstrong*, 671 So.2d 307 (La. 1996)(finding defendant presented overwhelming proof of insanity despite police officer and clerk of court testimony that defendant seemed normal and coherent); *Peters*, 643 So.2d at 1226. But see *White v. Estelle*, 669 F.2d 973 (5th Cir. 1982); *United States v. Andrew*, 666 F.2d 915 (5th Cir. 1982); *United States v. Mota*, 598 F.2d 995 (5th Cir. 1979), cert. denied, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1979). While helpful reminders that lay witness testimony may adequately rebut expert testimony, *White*, *Andrew*, and *Mota* are readily distinguishable from the present case in that they involved fewer experts testifying on the defendant's behalf , the experts that did testify made substantial concessions during cross-examination, the government offered some expert testimony in two of the cases, and the lay witnesses had more exposure to the defendants.

[87] *Wright v. United States*, 250 F.2d 4, 10 (D.C. Cir. 1957)(noting that "a statement that the witness never observed an abnormal act on the part of the accused is of value if, but only if, the witness had prolonged and intimate contact with the accused") (quoting *Carter v. United States*, 252 F.2d 608 (D.C. Cir. )); see also *Fielding v. United States*, 251 F.2d 878 (D.C. Cir. 1957).

[88] State v. Roy, 395 So.2d 664, 669 (La. 1981).

23

insufficient to rebut defendant's experts where the government's evidence consisted of testimony

by lay witnesses that the defendant could talk intelligibly, was relaxed, could run, could perform

movements involved in a robbery, appeared alert, and did not appear to be under the influence of

drugs.[89]

There was some suggestion by the state as to a possible motive for Petitioner's actions,

namely, that he was being pursued by rebuffed drug dealers and, after the fairgrounds encounter,

was fearful of being prosecuted.  Other than the Petitioner's own belief that he was being

pursued by drug dealers and other persons, there is no evidence that rebuffed drug dealers were,

in fact, pursuing Petitioner.  Even assuming there was some validity to these speculative

arguments, Petitioner's experts established that independent of whether someone was actually

following him, they personally observed him and found him exhibiting psychotic behavior.[90]

Finally, giving full credence to the notion that Petitioner was, in fact, being pursued by rebuffed

drug dealers would still not render his actions objectively reasonable.  The entire scenario - a

family man with no violent criminal history, fleeing his home in Texas with one son while

leaving behind his wife and other children, driving to an unknown city, refusing to stay in hotels

despite having sufficient cash to do so, and eventually secreting himself to a shed on the

premises of a private residence – does not suddenly appear reasonable merely by assuming that a

few drug dealers were pursuing Petitioner.

In the absence of a valid reason to disregard the testimony of Petitioner's experts, this

Court finds that viewing the evidence in the light most favorable to the prosecution, no

reasonable jury could have found that Petitioner failed to prove by a preponderance of the

---

[89] 465 F.2d 451 (9th Cir. 1972).

[90] Rec. Vol. V, Trial Transcript, p. 220 (Dr. Carrington)(noting that it would be extremely hard for someone to fake the disorganized thought processes Petitioner exhibited which typify a person suffering from a mental disease); p. 233 (Dr. DeLand)(indicating that it would be nearly impossible to perpetually fake symptoms while under 24/7 observation and that she specifically evaluated him based, in part, on his demeanor); pgs. 278, 280 (Dr. Kronberger).

evidence that he was insane at the time of the offense.  In reaching this decision, the Court is not unsympathetic to the difficult decision faced by the jury and the state courts in a case such as this, particularly given the undoubtedly emotional and potentially prejudicial circumstances surrounding Petitioner's trial and appeal.  Indeed, as will be discussed later, had the trial taken place under less emotional circumstances, the jury may very well have reached a conclusion that was not "contrary to both medical testimony and visceral reaction."[91]  As it stands, however, the jury's verdict flies in the face of overwhelming evidence that Petitioner was insane at the time of the incident, and, as the numerous cases cited herein demonstrate, it was an unreasonable application of the due process standard set out in *Jackson* for the state courts to have concluded otherwise.

Turning to Petitioner's second claim of insufficient evidence, that no reasonable jury could find that Petitioner had the requisite intent or knowledge to harm a police officer, this Court finds it unnecessary to engage in an extended discussion of the merits of this argument. Although the Court cannot say that the jury was acting unreasonably in concluding that the lighting and setting afforded someone in Petitioner's location sufficient opportunity to see that he or she was being pursued by police officers, though there was testimony that it was otherwise,[92] the fact that Petitioner proved that he was delusional and incapable of distinguishing between right and wrong sufficiently negates any inference that he intended to harm a police officer or that he was aware that he was shooting at a police officer engaged in the lawful course of his duties.[93]  Thus, having determined that no reasonable jury could find that Petitioner had

---

[91] *Brock v. United States*, 387 F.2d 254, 258 (1967).

[92] Rec. Vol. V, Trial Transcript, pgs. 59-61, 66-67, 75-76, 98, 111-113.

[93] The Court would also note that Petitioner's situation is not wholly unlike that of the defendant in *Donahue v. Cain*, 231 F.3d 1000 (5th Cir. 2000). In *Donahue*, the Fifth Circuit found that there was insufficient evidence to support a rational trier of fact in finding specific intent to harm a police officer where the officer's testimony established that the defendant was unable to see the officer's badge, the officer did not identify himself as an officer, the officer approached the scene in an unmarked vehicle, and the defendant did not attempt to harm the officer once

(continued...)

failed to prove by a preponderance of the evidence that he was insane at the time of the incident, this Court has necessarily found that no reasonable jury could find that Petitioner had the requisite knowledge or intent to kill a police officer.

### (2) *Brady* Violations

In his second assignment of error, Petitioner argues that the state violated *Brady v. Maryland* when it failed to disclose, prior to trial, (1) certain statements Petitioner's wife and son made to investigating officers shortly after the shooting and (2) a police report containing a statement attributed to Dr. Black prior to the shooting that Petitioner "look[ed] to be crazy."  In response, the state asserts that the transcript containing Petitioner's statements was, in fact, made available to defense counsel in sufficient time to be of use to Petitioner and that the statement contained in the police report was not exculpatory or material.[94]   Petitioner's arguments were considered and denied following an evidentiary hearing on Petitioner's application for post-conviction relief.  The hearing judge found evidence in the record indicating that defense counsel had the transcript and was able to utilize the transcript containing statements by Petitioner's wife and son, such that there was no *Brady* violation.  The judge further found that the statement that Petitioner "look[ed] to be crazy" was not exculpatory and therefore not subject to *Brady* requirements.  The Court finds no *Brady* violation with respect to the statements by the Petitioner's wife and son, but does find a violation as to the statement of Dr. Black.

Because a *Brady* claim presents a mixed question of law and fact, this Court must defer to state court decisions denying relief unless such decisions are "contrary to, or an unreasonable

---

[93](...continued)
the officer's status was established.

[94] At the evidentiary hearing for post-conviction relief and again in its response to the habeas petition (Fed. Rec. Vol. V, p. 26) the state cites to page 244 for Mrs. Perez and page 256 for Salvador Perez, Jr. as evidence that the defense was provided copies of their statements.

Case 2:04-cv-01905-HGB-LM   Document 11   Filed 01/08/08   Page 27 of 60

application of, clearly established Federal law, as determined by the Supreme Court."[95]  Pursuant to *Brady*, the state is required to furnish a defendant with evidence "materially favorable to the accused."[96]  According to the Supreme Court, the *Brady* duty applies to impeachment evidence, exculpatory evidence, and even evidence "known only to police investigators and not to the prosecutor" where that evidence is favorable to the accused and material to either guilt or punishment.[97]  Thus, to succeed on a *Brady* claim, a defendant "must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment."[98]  Evidence is considered material for the purposes of a Brady claim "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[99]  This standard does not "require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal."[100]  Instead, reversal is proper where a defendant has made a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." [101]  When multiple pieces of evidence are at issue, evidence that the government failed to disclose to the defendant should be

---

[95] 28 U.S.C. 2254(d)(1); *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir. 1999).

[96] *Youngblood v. West Virginia*, 126 S.Ct. 2188, 2190 (2006) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

[97] *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); see also *United States v. Agurs*, 427 U.S. 97 (1976).

[98] *DiLosa v. Cain*, 279 F.3d 259, 262-63 (5th Cir. 2002).

[99] *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375)).

[100] *Youngblood*, 126 S.Ct. at 2190 (quoting *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555).

[101] *Id.*

considered collectively, not item-by-item, in determining whether the materiality requirement of *Brady* was violated.[102]

The disputed statements made by Petitioner's wife and son came from tape recorded statements taken by the Homicide Department on July 18, 1996, the day after the shooting.  In the course of the conversation with the police, Petitioner's wife and son indicated that Petitioner had been exhibiting symptoms of paranoid delusions prior to his flight from Texas.[103]  Inasmuch as these statements corroborate the testimony of Petitioner's wife and son and directly refute the

---

[102] *Kyles*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.ed 490; *Spence v. Johnson*, 80 F.3d 989 (5th Cir. 1996), cert. denied, 117 S.Ct. 519, 136 L.Ed.2d 407 (U.S. 1996).

[103] Rec. Vol. 6, Petitioner's Application for Post-Conviction Relief and accompanying Memorandum asserts that the following statements, made by Petitioner's wife during the July 18, 1996 phone call with Homicide detectives, were withheld in violation of *Brady*:

    Q: Did you receive a phone call from your husband at any time, er ... in the last three days?
    A: Only on Monday the 15th ...
    Q: And can you tell me er ... what your husband told you in this phone conversation?
    A: He said ... er we are being ... we were being followed ... they are trying to kill us ... er ... he said don't ... he said er ... I'm not coming back until ... until they calm down ... tell them that I'm not coming back until they calm down.  He said er ... I will be in contact with you. ...
    Q: Did he ... when he referred to THEY ... did he say who THEY were?
    A: No ... he didn't he just said, THEY, and they were in a small black car like a TransAm, or a Camaro or something like that ... but he ... he didn't say who ...
                ***
    Q: Prior to this incident, did you have any threats, or do you know of any threats made upon him, yourself or your family ... ?
    A: No ... never ... but for the past ... for the past couple of days ... when he was mentioned ... he was starting to act kind of strange ... like ... like he knew something was going to happen ... but I didn't know what ... because I never heard ... or never heard him talk to anyone ... but he was like acting like ... saying, Those people are trying to get us out of here ... meaning out of our home ... out of our ranch ...

 The statements made by Petitioner's son in a July 18, 1996 interview with the NOPD are:
    Q: Can you tell me in your own words ... the facts and circumstances that led up to you and your father, Salvador Perez, Sr. er ... leaving Seguin, Texas, and traveling to New Orleans, can you tell me what transpired, and why you left, and what happened when you got here ...
    A: The reason why we left Seguin, Texas is cause we didn't ... me and my Dad didn't want my Mom, and my little sister and my little brother get in trouble, so we left and come here, so the gangs won't ... won't follow us and away from them.
    Q: You say the gang ... can you ... do you know what gang it is?
    A: No, Sir.
    Q: Is it a from your community ... or from another state?
    A: I don't know.
                ***
    Q: Let's ... let's ... just start over again ... er start from the beginning like you had just started ... about leaving ... and why you left.
    A: My step-grandfather's friends ... they er ... my Mom and Dad think that they sell drugs ... and ... and I think that they asked my father if he wanted to be in drug making business ... or something ... and my father said, no ...

state's primary theory of the case, that Petitioner and his family made up or greatly exaggerated symptoms of Petitioner's illness after the shooting, these statements are undoubtedly within the purview of *Brady* and, therefore, should have been made available to Petitioner.  The primary issue in dispute in relation to these particular statements is whether the state actually withheld the evidence from defense counsel by failing to timely disclose the statements to Petitioner.

The Supreme Court has not explicitly decided if *Brady* material must be disclosed prior to trial, though many courts ascribe to the view that *Brady* does not require pretrial disclosure as long as the disclosure was not made so late as to prevent the defense from using the material effectively in preparing or presenting its case.[104]  The state judge considered Petitioner's arguments at the post-conviction hearing and found that the state must have furnished defense counsel with the transcripts because defense counsel was clearly aware that Petitioner's wife and son had been interviewed, defense counsel seemed to have knowledge of the substance of what Petitioner's wife and son told the investigating officers, defense counsel did not lodge any objections about not having been timely provided with the statements, and the prosecuting attorney indicated that he remembered providing Petitioner with the necessary transcripts either before or during the trial.[105]

While this Court is unable to ascertain from the record when the statements were furnished to Petitioner's trial attorney, they were apparently provided to the defense at least during trial.[106]  The statements were, for instance, used on direct and cross-examination and again on redirect examination during the trial.  In addition, even assuming that the defense was

---

[104] *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001); *United States v. O'Keefe,* 128 F.3d 885 (5th Cir. 1997);*United States v. Bailey*, 123 F.3d 1381 (11th Cir. 1997); *United States v. Woodley*, 9 F.3d 774 (9th Cir. 1993); *United States v. Osorio*, 929 F.2d 753 (1st Cir. 1991); *Nassar v. Sissel*, 792 F.2d 119 (8th Cir. 1986).  *But see United States v. Behrens*, 689 F.2d 154, 158 (10th Cir. 1982) (finding that the relevant standard of materiality does not focus on trial preparation).

[105] Rec. Vol. VI, State Post-Conviction Hearing, pgs. 55, 72.

[106] Rec. Vol. V, Trial Transcript, pgs. 244, 256.

furnished with the statements after the trial began, there is no evidence that Petitioner's trial counsel was incapable of adequately using the transcripts.  The record, in fact, indicates that defense counsel utilized the transcripts when questioning witnesses.  Thus, even assuming Petitioner's counsel did not receive the evidence before trial, Petitioner has failed to show actual prejudice beyond his trial counsel's own failure to adequately use the transcripts.  Lastly, regardless of when Petitioner's counsel actually received the statements and as indicated by the state court judge, Petitioner's counsel knew that the wife and son had spoken with investigating officers after the shooting and had ample opportunity to investigate the substance of the statements by asking about them during an interview with Petitioner's wife and son.  Generally, prosecutors do not have a duty under *Brady* to disclose information to defense counsel if defense counsel has knowledge of the information, or if defense counsel could have obtained such information with reasonable diligence.[107]  Based on the current record,  it cannot be said that the state judge's determination that Petitioner's trial attorney was adequately furnished with or had sufficient knowledge of the statements was contrary to or a misapplication of clearly established federal law.

As to the police statement containing Officer Jackson's statement that Dr. Black told him that Petitioner "look[ed] to be crazy" prior to the shooting, the record does not reflect that Petitioner's trial counsel was either in possession of the report or timely furnished with it during Petitioner's trial.  Moreover, the prosecuting attorney indicated that he had no recollection that the report was furnished to Petitioner, and the judge at the evidentiary hearing found no evidence that the statement was disclosed.   The state court judge at the evidentiary hearing ultimately

---

[107] *Parr v. Quarterman,* 472 F.3d 245, 254 (5th Cir. 2006)*;United States v. Prior*, 546 F.2d 1254, 1259 (5th Cir. 1977) (holding that "[t]he government is not obliged under Brady to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself"); *United States v. Barham*, 595 F.2d 231 (5th Cir. 1979) (refusing to find a Brady violation where defense counsel was aware of the substance of allegedly exculpatory prior statements given by certain witnesses and was offered the opportunity by the court to subpoena those persons and question outside the presence of jury).

determined that the statement was not exculpatory.[108]  The state argues that the evidentiary hearing decision was correct and that it is not reasonable to assume that this allegedly exculpatory evidence would have influenced the outcome since the testimony of several expert witnesses failed to do so.  This Court disagrees and finds the statement extremely  useful for both exculpatory and impeachment purposes in addition to being "material" under *Brady*.

The primary issue at trial was Petitioner's sanity at the time of the incident with the state's evidence of sanity largely resting on eyewitness testimony that Petitioner acted and appeared normal.  A statement by one of the state's witnesses indicating that Petitioner appeared "crazy" only moments before the shooting would, therefore, corroborate Petitioner's claim, undermine the state's case, and greatly benefit Petitioner.  As mentioned, the statement could also have been useful for impeachment purposes.  Specifically, it could have been used to impeach Officer Jackson's testimony wherein Officer Jackson stated that Dr. Black did not say anything to him when he led him to the back stairs.  It likewise could have been used against Dr. Black who testified that he only said "this is dangerous."

Beyond being both exculpatory and impeachment evidence, the statement is clearly "material" under *Brady*. "Materiality" is frequently determined by weighing factors such as the importance of the witness, the significance of the evidence, and the strength of the prosecution's case.[109]  Out of these factors, the strength of the prosecution's case is frequently the most important factor.[110]  When the government's case is tenuous or filled with gaps, weaknesses, and

---

[108] Rec. Vol. VI, Transcript of Post Conviction Hearing, *State v. Perez*, No. 385-086, January 28, 2003, p.72.

[109] *United States v. Sipe*, 388 F.3d 471 (5th Cir. 2004).

[110] *Id*. at 478 (noting that "[t]he materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state")(quoting *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990), vacated on other grounds, 503 U.S. 930, 112 S.Ct. 1463, 117 L.Ed.2d 609 (1992)).

uncertainties, the suppressed evidence is more likely to be found material.[111]  In this case, the suppressed statement impacted the testimony of two key prosecution witnesses, Dr. Black and Officer Jackson, both of whom were present at the time of the incident.[112]  In addition, the statement directly implicated the primary issue in dispute in the case, namely, Petitioner's sanity at the time of the shooting, and did so in a significant manner.  A lay opinion that someone "look[ed] to be crazy" necessarily means that the observed conduct or demeanor was so strikingly bizarre or disturbing as to be noticeable by the average person.  This is strong evidence consistent with the opinions of all the experts and is especially important when uttered by one of only a few people present at the time of the shooting.[113]  Finally, as discussed at length in the context of the sufficiency of the evidence claims, the state's case rebutting Petitioner's evidence of insanity was not strong.  Not only did the state fail to offer any expert opinion indicating that Petitioner was sane at the time of the incident, but it also did not offer any observations by lay witnesses directly speaking to Petitioner's possible mental state at the time of the incident.  Instead, the state's witnesses merely documented Petitioner's actions, which the state then inferred demonstrated sanity.  Given the weakness of the state's case, the significance of a statement by a lay witness present at the scene corroborating Petitioner's experts, and the fact that the witness testified on behalf of the Prosecution, Dr. Black's statement that Petitioner "look[ed] to be crazy" could reasonably be expected to impact the state's case and lead a reasonable jury to a different conclusion.[114]

---

[111] *Monroe v. Angelone*, 323 F.3d 286, 312 (4th Cir. 2003); *United States v. Sheehan*, 442 F.Supp. 1003 (D. Mass. 1977); *State v. Falkins*, 356 So.2d 415 (La. 1978).

[112] See *Youngblood*, 126 S.Ct. 2188 (finding suppression of a note by a state trooper indicating that testimony that defendant sexually assaulted victim was false and that the encounter was consensual a violation of *Brady*).

[113] Compare *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed. 2d 342 (1976)(finding reversal of conviction required in situation where one of only two eyewitnesses told the prosecutor that the defendant was not the perpetrator).

[114] *Strickler v. Greene*, 527 U.S. 263, 280 (1999)(quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375)).

32

The state's argument that the statement was not "material" because "it is ludicrous to suggest that a comment from a person who had virtually no contact with petitioner would have influenced the jury ... [i]f the jury was unconvinced by six medical experts," does little more than underscore the unreasonableness of the jury and/or the prejudice of the trial setting.  It certainly does not rebut the conclusion that the statement was suppressed, that it benefitted Petitioner's case, and that it was objectively "material" evidence which should have been disclosed.  Here, the thrust of the state's rebuttal of the Petitioner's insanity defense was that it was concocted after the fact by the Petitioner and his family.  Dr. Black's on the scene spontaneous observation that Petitioner appeared to be "crazy" just prior to the shooting directly refutes the state's position.  For the state courts to have held this evidence not "material" was an unreasonable misapplication of *Brady* and its progeny.

**(3) Improper remarks by trial judge and/or erroneous jury instructions.**

In his third assignment of error, Petitioner claims that the trial judge gave erroneous instructions and/or improperly commented on the evidence in regards to the element of specific intent.[115]   The Louisiana Fourth Circuit Court of Appeal declined to address this assignment of error on direct appeal, "because Perez failed to object and preserve the issue for appellate review."[116]  Citing Louisiana Code of Criminal Procedure Article 801, the Court of Appeal found that a defendant "may not assign as error the giving or failure to give a jury charge or any

---

[115] Petitioner does not appear to take issue with the jury instructions as originally given by the trial court.  Rather, Petitioner finds fault with the trial court's response to the jury's request for clarification of the specific intent requirement for first degree murder.  Specifically, the jury sought clarification of whether Petitioner had to have knowledge that he was shooting a police officer.  The trial judge indicated that the statute did not specifically say "knowledge" but that "maybe some inferences can be made about knowledge, about knowing, if you deal with all that you heard and deal with whether there was intent or not intent, or lack of intent."  A juror then sought a definition of intent, to which the trial judge responded that "[y]ou have to really infer intent from the circumstances. And I think that you might have heard enough testimony and evidence that you can make inferences based on the circumstances surrounding the act." Rec. Vol. V, pgs.336-338.

[116] Rec. Vol. V, Fourth Circuit Opinion, *State v. Perez*, 98-KA-1407, November 3, 1999, p. 36-37.

portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error."[117]  In addition, the Court of Appeal cited Louisiana Code of Criminal Procedure Article 841(A), finding that a defendant "cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error."[118]

A federal court will not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."[119]  For purposes of habeas review, a state court's decision is not sufficiently adequate or independent if it "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and ... the adequacy and independence of any possible state law ground is not clear from the face of the opinion."[120]  Even if the procedural grounds upon which the state court opinion rests are sufficiently adequate and independent, if a habeas petitioner can demonstrate cause for his failure to comply with the state rule and prejudice resulting from the default or, alternatively, that a miscarriage of justice will occur if he is not granted relief, then a federal court may reach the merits of his claim.[121]

As indicated above, the Louisiana Court of Appeal's decision rested squarely on procedural provisions contained within the Louisiana Code of Criminal Procedure.  Furthermore, the state court's decision is devoid of any reference that would indicate that the state court

---

[117] Rec. Vol. V, Fourth Circuit Opinion, *State v. Perez*, 98-KA-1407, November 3, 1999, p. 36.

[118] Rec. Vol. V, Fourth Circuit Opinion, *State v. Perez*, 98-KA-1407, November 3, 1999, p. 36.

[119] *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lott v. Hargett*, 80 F.3d 161, 165 (5th Cir. 1996); *Amost v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995), *cert denied*, 116 S.Ct. 557 (1995); *Harris v. Reed*, 489 U.S. 225, 262-63, 109 S.Ct. 1038, 1043 (1989).

[120] *Id*. at 733 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41, 103 S.Ct.3469, 77 L.Ed.2d 1201 (1983)).

[121] *Sawyer v.Whitley*, 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); *Miranda v. Leibach*, 394 F.3d 984 (7 th Cir. 2005), *cert. denied*, 125 S.Ct. 2947 (U.S. 2005); *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999).

addressed Petitioner's claim on the merits or otherwise based its ruling on federal law.  Thus, Petitioner fails to establish other than that the state law grounds are adequate and independent.

Evidently seeking exemption from the rule set out in *Coleman*, Petitioner asserts, as cause for his failure to satisfy Louisiana's contemporaneous objection requirement, ineffective assistance of trial counsel.  The record does not substantiate that counsel was deficient in failing to object to the trial court's jury instructions.  Moreover, Petitioner does not show prejudice from the procedural bar.  Assuming that the trial court's response to the jury's inquiries  was improper or insufficient, the record reflects that the trial court initially summarized the law regarding specific intent correctly.  There is a presumption that the jury followed these instructions.[122]  In addition, the trial judge stated, in admonishing the jury, "[i]f during the course of this trial, I have given you the impression that I have an opinion regarding any fact in this case, you are to disregard that impression.  Likewise, if I have given you the impression that I have an opinion regarding the guilt or innocence of the defendant, you are to disregard that impression. That is an issue for you and you alone to decide."[123]  An instruction may not be judged in isolation, but must be considered in the context of the instructions as a whole and the trial record.[124] Considering these comments in the context of the instructions as a whole, the Court finds that the judge's admonishment cured or rendered harmless any error potentially attributable to the allegedly improper comments.  Thus, Petitioner has not demonstrated prejudice from his attorney's failure to contemporaneously object and the state court's later invocation of the procedural bar.

---

[122] *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000).

[123] Rec. Vol. V, Trial Transcript, p. 321.

[124] *Estelle v. McGuire*, 502 U.S. 62, 71-72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *see also United States v. Frady*, 456 U.S. 152, 169, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (indicating that the court should evaluate jury instructions in the context of the overall charge to the jury as part of the entire trial process).

Finally, Petitioner does not raise, and the record does not support the notion that enforcing the procedural bar as to this claim would constitute a gross miscarriage of justice. While Petitioner's trial was marred by injustice in relation to other claims which require reversal of Petitioner's conviction, the alleged impropriety at issue here did not "so infect[] the entire trial that the resulting conviction violates due process."[125]

### (4) Improper Prosecutorial Remarks; Failure to Admit Evidence

Petitioner next argues that he was deprived due process when the prosecutor made an improper statement concerning written reports by Petitioner's experts and the trial court failed to declare a mistrial or, in the alternative, when the trial court refused to allow the jury to view the written reports. Petitioner raised a similar argument in his application for post-conviction relief, though he apparently put it in terms of prejudice caused by the trial court's failure to admit the written reports and thereby remedy the harm caused by the prosecutor's allegedly erroneous remark.[126] There is no evidence that defense counsel contemporaneously objected to the allegedly improper remark and the trial judge at the evidentiary hearing did not specifically analyze this argument, though he did generally deny Petitioner's claims for relief.

"A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."[127] In determining whether reversal is justified in a particular case,

---

[125] *Estelle*, 502 U.S. 62, 72 (1991) (finding that a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process in order to obtain federal collateral relief for errors in the jury charge); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)("[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional] right.").

[126] Rec. Vol. VI, Application for Post-Conviction Relief, *Perez v. Cain*, No. 385-086, Section A.

[127] *United States v. Pando Franco*, — F.3d —, 2007 WL 2875969 (5th Cir. 2007) (citing *United States v. Lowenberg*, 853 F.2d 295, 302 (5th Cir. 1988)); *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)(stating that "[i]nappropriate prosecutorial comments, standing alone," will not justify reversal of a conviction obtained in an otherwise fair proceeding).

the court must first determine if the prosecutor made an improper remark.[128]  If the court finds

that a prosecutor's remark was improper, the court then analyzes whether the remark "prejudiced

the defendant's substantive rights."[129]  In making that determination, the court considers (1) the

magnitude of the prejudicial effect of the statement; (2) efficacy of any cautionary instruction;

and (3) the strength of the evidence of the defendant's guilt.[130]  The determinative question,

analyzed in the context of the trial as a whole, is "whether the prosecutor's remarks cast serious

doubt on the correctness of the jury's verdict."[131]

> The allegedly false statement at issue follows:

> Doctors, doctors, doctors. You know, that's not the only time we talked to these doctors. We put him on the witness stand. We got transcripts after transcripts, and reports after reports. And they say something different here. They say something here. They say something different today. I'm going to give you one example and I'm not going to talk anymore about doctors.  Dr. Pena.  Dr. Pena seemed very intelligent.  Remember Dr. Pena, a little short man?  Very intelligent.  A lot of degrees.  Looks at people.  He tells you that he can better assess whether somebody's telling the truth over a telephone than he can talking to them face to face.  He told you that right there.  I'm going to read you something ... [proceeds to read the Sixth Amendment of the United States Constitution] ... Confront them. What do you think that's for? That's so you can look at their demeanor. If I told Judge Elloie I wanted to handle this trial over the telephone, he'd put me in Feliciana. That's all I got to say about doctors.[132]

> Petitioner claims that this statement by the prosecutor was improperly prejudicial because

it implied that the mental health reports submitted by the expert witnesses contradicted their

testimony, when, in reality, the reports were consistent.  Insofar as this would appear to be a

reference to extrinsic evidence and imply that the Prosecutor has knowledge of facts not before

---

[128] *United States v. Morganfield*, 501 F.3d 453, 467 (5th Cir. 2007)(citing *United States v. Insaulgarat*, 378 F.3d 456, 461 (5th Cir. 2004), cert. denied, 543 U.S. 1013, 125 S.Ct. 637, 160 L.Ed.2d 480 (2004)).

[129] *Id*. (quoting *United States v. Munoz*, 150 F.3d 401, 415 (5th Cir. 1998)).

[130] *Lowenberg*, 853 F.2d at 302.

[131] *United States v. Guidry*, 456 F.3d 493, 505 (5th Cir. 2006); *United States v. Freeman*, 434 F.3d 369, 375 (5th Cir. 2005).

[132] State Rec. Vol. V, Trial Transcript, pgs. 317-18.

the jury, it has the potential to be highly prejudicial.[133]  It does not appear, however, that the prosecutor's statement was improper or sufficiently prejudicial in light of the context in which it was made.

Looking first at whether the statement was improper, the Court finds that the prosecutor's statement, though confusing, is not without basis in the record.  The prosecutor was apparently trying to point out inconsistent statements made by and/or between Petitioner's experts.  It is not improper for a prosecutor to point out inconsistencies in witness testimony in closing statement so long as there is some basis in the record for their remarks.[134]  In this case, the jury heard testimony to the effect that Dr. Salcedo and Dr. DeLand, both of whom admitted on the stand that they had initially filed reports indicating that Petitioner was malingering, changed their opinion regarding Petitioner's sanity.  Thus, there is some basis for the prosecutor's statement that Petitioner's experts offered testimony contradicting their earlier reports.  While the sole example of an inconsistent statement by an expert that the prosecutor cites is that of Dr. Pena, who did not offer testimony contradicting any of his earlier assertions, the fact remains that there was evidence given during trial establishing inconsistent reports by two of Petitioner's experts.  In addition, while Dr. Pena's statement is not an example of a prior inconsistent statement, it is arguably at odds with assertions by Petitioner's other experts that it is important to interview people in person in order to determine if they are being honest.  Thus, however poorly worded the prosecutor's claim was, the overarching idea that Petitioner's experts were not wholly consistent is supported by the record and by the example cited by the prosecutor.  As such, the prosecutor's comment does not appear to be improper.

---

[133] *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); see also *Hurley v. Hodge*, 426 F.3d 368 (6th Cir. 2005).

[134] *Bates v. Bell*, 402 F.3d 635 (6 th Cir. 2005)("To be certain, prosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence");

Even assuming that the prosecutor's statement was improper, however, reversal would not be appropriate because the comment does not put the validity of the juror's verdict in serious doubt. To begin with, the confusing manner in which the statement was made detracts from its potential impact on the jury. Moreover, while the trial judge did not grant a mistrial, the trial judge specifically told the jury that closing statements are not evidence. Later, the trial judge indicated that the only information that the jurors should base the verdict on was evidence consisting of "the testimony of the witnesses and the exhibits which the Court [ ]permitted the parties to introduce."[135] While general, such instructions, especially when reiterated, have previously been found sufficient to offset any unfair prejudicial effect of the prosecutor's statements.[136] Finally, while the prosecution's case establishing Petitioner's sanity was insufficient, the prosecutor's reference to an example that has little to do with the point the prosecutor claims to be making cannot be said to be particularly damaging to Petitioner's case. If anything, the prosecutor's confusing argument would seem to undermine the state's credibility more than Petitioner's.

With respect to state court evidentiary rulings, Petitioner is apparently referring to the trial court's refusal to permit counsel to publish the testifying medical experts' reports to the jury.[137] Petitioner asserts that this was error because the prosecutor's statements indicated that the experts' reports contradicted their testimony and that the Court either should have declared a mistrial or permitted the jury to review the expert's reports. First, as discussed, the prosecutor's statement was not sufficiently improper to have warranted a mistrial. As to the latter suggestion, assuming the judge's initial refusal to publish the reports to the jury was erroneous, a federal

---

[135] Rec. Vol. V, p. 321.

[136] *United States v. Thompson*, 482 F.3d 781, 786-87 (5th Cir. 2007).

[137] Rec. Vol. V, Trial Transcript, p. 281.

habeas court does not sit to review the correctness of such rulings.[138]  "'[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'"[139]  Nor will the Court consider whether the jury should have been allowed to examine the reports after the prosecutor made the statement in closing argument as Louisiana law expressly prohibits the jurors from looking at expert reports during deliberation.

The Court finds that Petitioner has not established that he was prejudiced by the closing comments of the prosecution, when taken in the context of the trial as a whole.  Thus, the Court finds nothing contrary to, or involving an unreasonable application of, clearly established Federal law in the state court's decision denying relief on this claim.

### (5) Ineffective Assistance of Counsel.

Petitioner claims that his trial counsel was ineffective for failing to object to highly prejudicial and unnecessary evidence, filing inapplicable pretrial motions, failing to properly examine Petitioner's expert witnesses, failing to obtain exculpatory evidence, failing to object to improper jury instructions, and permitting a student practitioner to play a prominent role in the defense.  Petitioner's claim with respect to the student practitioner was raised on direct appeal and in his application for post-conviction relief.  In discussing the claim on direct appeal, the Louisiana Fourth Circuit Court of Appeal found that Mr. Jenkins sufficiently supervised Mr. Michaelson and that the record demonstrated that "Mr. Michaelson's performance was exemplary."[140]  The rest of his ineffective assistance claims were raised in Petitioner's application for post-conviction relief.  After receiving testimony and arguments on the issue at

---

[138] *Guidry*, 456 F.3d at 505 (quoting *United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir. 1994)); *Mercado v. Massey*, 536 F.2d 107, 108 (5th Cir. 1976).

[139] *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir. 1999), quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); see also *Molo v. Johnson*, 207 F.3d 773, 776 n.9 (5th Cir. 2000)( holding "[f]ederal habeas review does not extend to state court conclusions of state law"); *Hogue v. Johnson*, 131 F.3d 466, 506 (5th Cir. 1997) (noting that a disagreement as to state law is not cognizable on federal habeas).

[140] Rec. Vol. V, Fourth Circuit Opinion, *State v. Perez*, 98-KA-1407, November 3, 1999, p. 24.

the evidentiary hearing, the judge denied the claim, finding no ineffective assistance of counsel in this case.  In rejecting Petitioner's arguments, the judge stated that he personally witnessed the defense counsel's actions in pretrial hearings and at trial and would not second-guess their trial strategies.  He further indicated that counsel cross-examined the state's witnesses and that he witnessed no counsel incompetence during the proceedings.[141]  This Court disagrees and finds that defense counsel's failure to object to prejudicial evidence was deficient and prejudiced Petitioner's case.

A claim of ineffective assistance of counsel is a mixed question of law and fact.[142] Therefore, this Court must defer to the state court on these claims unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

In *Strickland v. Washington*, the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.[143] A petitioner seeking relief must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced his defense.[144]  Petitioner bears the burden of proof when asserting a claim for ineffective assistance of counsel and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."[145]  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong.[146]

---

[141] Rec. Vol. VI, Transcript, Post Conviction Hearing, *State v. Perez*, No. 385-086, Jan. 28, 2003, p. 40-42, 46.

[142] *Moore v. Co*ckrell, 313 F.3d 880, 881 (5th Cir. 2002), *cert. denied*, 538 U.S. 969, 123 S.Ct. 1768 (2003).

[143] *Strickland v. Washington*, 466 U.S. 668 (1984).

[144] *Id.* at 697.

[145] *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000).

[146] *Strickland v. Washington*, 466 U.S. 668, 697 (1984).

To prevail on the deficiency prong, a petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.[147]  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."[148]  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.[149]  As the Supreme Court explained, "[judicial scrutiny of counsel's performance must be highly deferential" such that the reviewing court should make "every effort to ... eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct from counsel's perspective at the time."[150]  There is, therefore, a strong presumption that the conduct of a defendant's counsel falls within a wide range of reasonable representation.[151]  Despite this presumption, however, a petitioner may satisfy the deficient performance prong by showing that the representation at issue falls "outside the wide range of professionally competent assistance."[152]  Thus, while the *Strickland* presumption is "highly demanding," it is "by no means insurmountable."[153]  Moreover, "*Strickland*'s 'in light of all circumstances' review does not preclude a finding of ineffective assistance where the alleged deficient actions or omission centers upon a single incident, if that error is sufficiently egregious and prejudicial."[154]

---

[147] *Styron v. Johnson*, 262 F .3d 438, 450 (5th Cir.2001), *cert. denied*, 534 U.S. 1163 (2002).

[148] *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir.1998).

[149] *Strickland*, 466 U.S. at 689.

[150] *Id.*, at 689.

[151] *Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir.1986); *Matheson v. King*, 751 F.2d 1432, 1441 (5th Cir.1985).

[152] *Id.,* at 690.

[153] *Kimmelman v. Morrison*, 477 U.S. 365, 382, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305, 323 (1986).

[154] *United States v. Cronic*, 466 U.S. 648, 657 104 S.Ct. 2039, 2046 n. 20, 80 L.Ed.2d 657 (1984).

In order to prove prejudice from trial counsel, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[155]  A reasonable probability is one "sufficient to undermine confidence in the outcome."[156]  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."[157]  In other words, a reviewing court "must consider the totality of the evidence before the judge or jury," which in turn means consideration of the quantity and quality of the evidence against the defendant.[158]  "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."[159]

Petitioner first asserts that his trial counsel was ineffective for failing to object to prejudicial evidence and testimony.  In particular, Petitioner claims that the following items were highly prejudicial and should have been objected to: (1) the testimony of Danine McCormick in the guilt phase regarding her marriage to the deceased officer; (2) the testimony of Dr. Myron Smith regarding injuries sustained by the police dog; (3) x-rays documenting the police dog's injuries; (4) the playing of the 911 call made by Officer Jackson after Officer McCormick was shot; and (5) the testimony of Dr. William Newman regarding the autopsy and his opinion of how long Officer McCormick might have survived after being shot.  In addition, Petitioner asserts that his trial counsel was ineffective for failing to object to the state's hypothetical and speculative arguments.

---

[155] *Strickland*, 466 U.S. at 694.

[156] *Id.*

[157] *Crockett*, 796 F.2d at 793.

[158] *Strickland*, 466 U.S. at 695.

[159] *Id.*, at 696.

At the outset, it bears mention that the record is replete with instances in which Petitioner's trial counsel performed reasonably.  Counsel interviewed witnesses, retained or otherwise contacted several mental health experts who spoke on Petitioner's behalf at trial, raised valid objections throughout Petitioner's trial, and sought suppression of several items which were unduly prejudicial.  Even when counsel provides adequate representation in some respects, however, counsel's conduct in others may be so deficient as to severely prejudice a defendant's case.[160]  In determining whether counsel's failure to object was objectively unreasonable in this instance, the Court must first determine the circumstances surrounding Petitioner's trial and the extent to which the aforementioned items and testimony were prejudicial.

In this case, there was an appreciable potential for unfair prejudice.  Trials involving slain police officers are understandably highly charged,[161] and there is evidence that this case was no exception.[162]  Petitioner's status as an outsider, both to the area and to the country, did little to endear him to the jury; a situation that was probably not alleviated by his concession that he shot Officer McCormick and almost certainly worsened by the numerous police officers testifying against him and his reliance on a notoriously unpopular defense.  In light of these circumstances, the admittance of any amount of unnecessary and prejudicial evidence would be

---

[160] See *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (finding trial counsel deficient when they failed to investigate a court file containing mitigating evidence even though they pursued other avenues of unearthing mitigating information, including interviewing the defendant and his family members and consulting mental-health experts); *Dugas v. Coplan*, 428 F.3d 317, 328 (1st Cir. 2005) (holding that where defense counsel visually inspected the fire scene himself, talked with the state's experts, did some limited reading, and talked with other defense attorneys, he nonetheless failed to adequately investigate an available "no arson" defense).

[161] *E.g., Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Woods v. Dugger*, 923 F.2d 1454 (11th Cir. 1991).

[162] In pretrial hearings, for instance, the trial judge frequently highlights the need to adjudicate the matter quickly.  In addition, two newspaper articles discussing Petitioner's trial, indicated that it was "high-profile" and emotional. One, for example, stated that "Jackson's testimony sent some relatives and friends of officer Chris McCormick from the courtroom in tears, while others stayed and wept."  Pamela Coyle, staff writer, *Partner Fell After 'Pop' Routine Call Led to Police Death*, The New Orleans Times-Picayune, March 13, 1998, p. B1.  Petitioner's trial counsel, evidently recognizing the potential for prejudice, lodged some objections to prejudicial items and sought unsuccessfully to have uniformed police officers, other than those there for safety, excluded from the courtroom.

particularly detrimental to Petitioner's case, a fact of which prudent counsel would have been keenly aware.

Beyond the potentially prejudicial setting itself, the evidence in question appears to be of the type properly excluded as unfairly prejudicial, extraneous, or wasteful under Louisiana law. The Louisiana Code of Evidence requires that evidence be relevant to be admissible. Evidence is relevant if it has any tendency to show any fact of consequence to the determination of the outcome.[163] Even if evidence is relevant, however, it may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[164] When a defendant has made a stipulation in regard to certain facts, it is a factor to be considered in determining whether evidence is too prejudicial to be admitted.[165] Nevertheless, "the state cannot be robbed of the moral force of its case merely because the defense offers a stipulation."[166]

Looking first at the testimony of Danine McCormick, it is clear that it was offered solely for emotional value. Testimony by a victim's family member is generally permitted during the sentencing phase of trial, but less frequently so during the guilt phase because of its prejudicial tendencies.[167] It may be admissible in the guilt phase, however, to corroborate the state's theory,

---

[163] LSA-C.E.Art. 401: "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence; *see also State v. Jones*, App. 5 Cir.2002, 824 So.2d 514, 02-267 (La.App. 5 Cir. 7/30/02), *writ denied* 847 So.2d 1254 (La. 2003) (explaining that relevant evidence in criminal case is that which tends to show commission of offense charged, and intent, or tends to negate commission and intent).

[164] LSA-C.E.Art. 403: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.

[165] *State v. London*, 559 So.2d 510 (La.App. 2d Cir.1990), *writ denied*, 565 So.2d 941 (La.1990).

[166] *Id.*

[167] *Jones v. United States*, 527 U.S. 373, 401-02, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (permitting victim impact evidence in the sentencing phase); *Payne v. Tennessee*, 501 U.S. 808, 823-27, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (indicating that such evidence is permissible at sentencing to counteract mitigation evidence).

establish relevant behavior by the decedent, or other similar purposes.[168]  In the case *sub judice,*
the widow's testimony was wholly unnecessary to proving the state's case, particularly given
that there was no question as to who actually shot Officer McCormick.  Reading over the
widow's testimony reveals that she contributed no facts helpful to the state in proving its case.
In fact, her testimony establishes only that she was married to Officer McCormick, where they
were married, how long they were married, that they had five children, and the location where
various family pictures were taken, including one in front of a memorial for slain police
officers.[169]  While the fact that Officer McCormick was married and had a family is relevant to a
penalty phase, because of the emotional setting and because she offered virtually no facts helpful
to the state in proving any of the elements of the crime charged, her testimony in the guilt phase
had no probative value and was significantly prejudicial.

Dr. Myron Smith's testimony and the x-rays of wounds sustained by Max the police dog,
were also unnecessary for the state to establish that Petitioner shot Officer McCormick.  While
relevant as part of the events leading to Petitioner's capture and descriptive of Petitioner's
behavior at the time of the incident, since Petitioner admitted to shooting the dog and testimony
by other Officers and even several of Petitioner's experts established that Petitioner shot the dog,
such evidence was emotionally geared, cumulative, wasteful of the court's time, confusing and
unfairly prejudicial.[170]

---

[168] This is unlike the situation in *State v. Caston*, 645 So.2d 1202 (La. App. 2 Cir.1994), *writ denied*, 654 So.2d 337,
(La. 1995), in which testimony by slain deputy's widow was permitted because it had probative value concerning the
victim's duty status, how he was armed, and how he operated jail for visitors.  Likewise, in *State v. Plater*, 643
So.2d 313 (La.App. 2 Cir.1994), *writ denied* 649 So.2d 402 (La. 1995), the victim's wife was permitted to testify
only because it established that the victim was present in the same area at which the defendant admitted to
participating in a robbery around the same time as the defendant, supporting the state's theory that the husband was
killed there and later dumped elsewhere.

[169] Rec. Vol. V, Trial Transcript, pgs.132-33.

[170] *See, e.g.*, *State v. Gay*, 697 So.2d 642 (La.App. 2 Cir. 1997) (finding that evidence that house where homicide
occurred was known as "crack house" and that defendant went to house to buy drugs rather than to commit armed
robbery which resulted in death was inadmissible since evidence about crack sales tended to confuse the issue of

(continued...)

The playing of the 911 phone call made by Officer Jackson was equally inflammatory, particularly when repeated during closing argument.  While 911 phone calls are potentially admissible, they usually must establish some fairly significant fact in dispute or support a critical element of the state's case.[171]  Officer Jackson testified that he radioed for help after seeing his partner shot, there was no dispute surrounding his doing so, and there is no indication in the record that the tape contained any identification or other information helpful to the state's case.  The tape was never referenced in terms of establishing a material element of the state's case or referred to at all absent the prosecutor's appeal to the jury for a verdict of guilty.  Under these circumstances, while the tape was relevant, its probative value was exceedingly limited.  It is obvious that the playing of the 911 tape served no purpose other than to appeal to the jury's emotions.  This is particularly true when examined in the context of the prosecution's closing argument, during which the prosecutor unambiguously appealed to emotion arguing "most of all, this is real" before playing the tape again.  The prosecutor then followed the tape with the statement "[t]ell him it is real.  Tell him it is wrong. Find him guilty."[172]

---

[170](...continued)

defendant's intent to kill with his motive for going to the house); *State v. Cuccia*, 933 So.2d 134 (La.App. 4 Cir. 2006), *writ denied,*939 So.2d 1273 (La. 2006) (sustaining State's objection to defense counsel's question of detective on cross-examination as to whether he learned of victim's boyfriend's drunken rage at the hospital where victim was taken since such question would have been a waste of time, as the jury had already learned that boyfriend was allegedly in a "drunken rage" at the hospital and was asked to leave); *State v. Kelly*, Sup.2001, 791 So.2d 1286 (La. 2001) (holding that probative value of other crimes evidence in the form of testimony from 15 non-victim witnesses was substantially outweighed by the danger of unfair prejudice in prosecution for indecent exposure to juveniles as such testimony was cumulative to three other witnesses who were allowed to testify that defendant previously touched them inappropriately or engaged in lewd and lascivious conduct in their presence); *State v. Tipton*, 705 So.2d 1142 (La.App. 1 Cir. 1997) (holding that defendant's half-sister's testimony and photographs regarding victim's alleged assaultive behavior toward half-sister at hospital were duplicitous of other record evidence of victim's assaultive behavior toward half-sister, and thus such repetitious evidence was inadmissible, and the failure to admit such evidence did not violate defendant's constitutional rights to due process and to present defense).

[171] *C.f. State v. Jones*, 891 So.2d 760 (La.App. 4 Cir.2004), *writ denied*, 916 So.2d 140, 2005-0124 (La. 2005) (permitting victim's phone call to 911 made during break-in as probative and necessary insofar as the state was required to show that defendant killed the victim during a burglary); *State v. Hurst*, 797 So.2d 75 (La.App. 1 Cir.2000), *writ denied,* 798 So.2d 962, (La. 2001); *State v. Sholes*, 782 So.2d 691 (La.App. 4 Cir. 2001), *writ denied* 810 So.2d 1136, (La. 2002); *State v. Derouselle*, 769 So.2d 141 (La.app. 4 Cir. 2000), *writ denied,* 799 So.2d 491, (La. 2001).

[172] Rec. Vol. V, Trial Transcript, p.320.  It is further worth noting that this is apparently the effect that the playing of
(continued...)

The only evidence cited by Petitioner that was probative and not objectively overly-prejudicial was the testimony offered by Dr. Newman regarding the cause of Petitioner's death. As part of its case, the state had the right to establish that Petitioner died from one gunshot wound and had the right to present evidence regarding the circumstances surrounding that death.[173]   Finally, in regards to the numerous hypotheticals the state asked Petitioner's experts about, the Court notes that such hypotheticals had the potential to confuse the jury.  Dr. Kronberger stated as much when, in responding to one of the prosecutor's hypothetical questions, he responded "[y]ou're asking me a very hypothetical question.  So I don't know how it would help.  I think it's just muddying the waters."[174]   In addition, the record reflects that other experts seemed equally confused by what the prosecution was asking.[175]   Having acknowledged that the hypotheticals could have confused the jury, however, the Court notes that Petitioner's trial counsel did object to some of the prosecution's questions as speculative and/or argumentative and cannot say that the failure to object to each an every hypothetical, even in the context of this trial, was deficient or objectively unreasonable.[176]

In light of the prejudicial circumstances surrounding the trial and the sheer volume of unfairly prejudicial, confusing, and unnecessary evidence offered by the state, trial counsel's cumulative failure to object to the aforementioned items was objectively unreasonable and

---

[172](...continued)
the tape had, as a newspaper article stated that "some of McCormick's relatives wailed and wept" as the tape was playing during closing. Pamela Coyle, Staff Writer, *Texas Man is Guilty of Cop's Murder, Conviction Draws Cheers in Courtroom*, The New Orleans Times-Picayune, March 14, 1998, p. B1.

[173] *State v. Gilmore*, 332 So.2d 789, 796 (La.1976)(noting that the state is entitled to the "moral force of its evidence" even in some situations where the defendant has made significant stipulations); see also *State v. Manieri*, 378 So.2d 931 (La.1979).

[174] This is similar to *State v. Wilson*, App. 3 Cir.1996, 677 So.2d 471, 1996-46 (La.App. 3 Cir. 5/8/96), writ denied 699 So.2d 49, 1996-1893 (La. 8/27/97), in which the court found that exclusion was proper based on the likelihood of the hypotheticals to confuse the jury as evidenced by the physician stating that he could not answer the hypothetical without actually examining the patient.

[175] Rec. Vol. V, Trial Transcript, p. 150 (Dr. Ritter); *Id.*, at 191-92 (Dr. Pena).

[176] *Id.*

constitutionally deficient.[177]  This is true even in light of the many ways in which counsel

performed sufficiently, including counsel's efforts in obtaining seven mental health experts.  It is

objectively unreasonable for counsel to presume that a fair trial can occur under circumstances

riddled with prejudice, especially when counsel was aware of the likelihood and potential for

prejudice, but nevertheless took insufficient actions to ensure that their client received a fair trial

from an impartial jury.[178]

Having found that Petitioner's counsel acted deficiently in failing to object to prejudicial

evidence, the Court must next determine whether counsel's deficient performance prejudiced

Petitioner's case.  In this regard it is helpful to remember that the question before the Court is not

one of the sufficiency of the evidence.  Rather, the question is whether counsel's failures

undermine the Court's confidence in the reliability of the result.  In this case, counsel's failures

permitted the state to put on prejudicial evidence that served no purpose other than to appeal to

the juror's emotions.  This occurred in the context of an already heated and emotionally charged

trial.  Counsel's strong insanity defense in the form of seven mental health experts was,

therefore, seriously undermined by counsel's own failure to object and ensure Petitioner a fair

trial from an impartial jury.   As such, this Court finds that had Petitioner's counsel objected and

prevented prejudicial circumstances from pervading Petitioner's trial it is reasonably likely that

the jury would have reached a different conclusion.

Having determined that Petitioner's Sixth Amendment right to counsel was violated

when he received ineffective assistance of counsel, the Court must lastly decide whether the state

---

[177] *Compare Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005)(holding that trial counsel's failure to object to repeated instances of prosecutorial misconduct constituted ineffective assistance of counsel in violation of *Strickland*); *Floyd v. Meachum*, 907 F.2d 347 (2d Cir. 1990)(finding the cumulative effects of state prosecutor's remarks in summation sufficient to so prejudice the trial as to warrant reversal); *Wynters v. Poole*, 464 F.Supp.2d 167 (WDNY 2006)(finding defense attorney's failure to object to prosecutor's cross-examination of the investigator who interrogated the defendant constitutionally deficient and ineffective).

[178] *Compare Wynters v. Poole*, 464 F.Supp.2d 167, 180 (WDNY 2006)(indicating that trial counsel's awareness of the impropriety made the failure to object especially egregious).

court's application of *Strickland* was unreasonable.  The only state court to expressly consider the issue was the judge at the evidentiary hearing who, as the same judge that presided over the trial, indicated that he did not observe any deficiency.  There was virtually no consideration or discussion of the cumulative effect such prejudicial evidence might have had in the context of the trial.  In addition, the hearing judge engaged in no investigation of whether the evidence was, in fact, prejudicial.  As the Supreme Court has recognized, a single deficiency can be sufficiently severe as to constitute ineffective assistance of counsel.[179]  The state court's failure to examine the alleged deficiencies and instead rely upon some instances of adequate representation was an unreasonable application of *Strickland,* especially since the hearing judge was apparently aware of the notoriety surrounding the case.

With respect to Petitioner's claims that his trial counsel was deficient in his pretrial conduct, that his counsel failed to properly examine Petitioner's expert witnesses, that counsel did not obtain exculpatory evidence or adequately introduce evidence favorable to the defense, that counsel failed to object to improper jury instructions and the state's improper closing statement, and that counsel improperly permitted a student practitioner to play a large role in Petitioner's defense, the Court finds these arguments without merit.  First, insofar as the Court previously found that the jury instruction and the state's closing statement  were not improper, it does not find counsel deficient for failing to object to them.

As to Petitioner's claim that counsel's pretrial conduct was deficient, Petitioner fails to establish or argue how counsel's actions prejudiced Petitioner.  Petitioner asserts that counsel's pretrial conduct was unreasonable because counsel filed inapplicable motions containing material misstatements of fact.[180]  While such obvious mistakes are arguably deficient and have

---

[179] *United States v. Cronic*, 466 U.S. 648, 657 104 S.Ct. 2039, 2046 n. 20, 80 L.Ed.2d 657 (1984); *Chatom v. White*, 858 F.2d 1479, 1486 (11th Cir. 1988).

[180] Two motions filed by Petitioner's trial counsel stated that "Defendant is black and poor, and accused of killing a

(continued...)

the potential to undermine pre-trial motions, Petitioner neither identifies which motions would have been otherwise granted nor demonstrates that this resulted in the trial court actually discounting any of counsel's legitimate legal arguments.  In the absence of such evidence or any explanation as to how these alleged pretrial deficiencies undermined Petitioner's case before the jury, the Court cannot say that Petitioner was prejudiced by trial counsel's extraneous filings.

Petitioner's assertion that his counsel improperly examined expert and/or lay witnesses is likewise without merit.  Generally, the failure to fully utilize a witness is not found to fall below an objective standard of care so long as the witness was put to reasonable use.[181]  In this case, the record only reflects that Petitioner's counsel may have not fully utilized Dr. Kronberger.[182]  It certainly does not establish that Petitioner's counsel improperly handled all of the experts.  Even assuming Petitioner's counsel did not fully utilize any of the experts, counsel elicited sufficient information to persuade a reasonable jury that Petitioner was insane and to rebut the state's limited arguments.  Counsel was, therefore, not deficient in its handling of the experts.

Finally, as to Petitioner's claim that a student attorney should not have been permitted to play a prominent role in his trial, the Court notes that the Louisiana Fourth Circuit and the judge at Petitioner's post-conviction evidentiary hearing both found that Mr. Michaelson performed sufficiently and was at all times under the supervision of Petitioner's primary defense counsel, Mr. Jenkins.  Moreover, Petitioner points to no specific instance where Mr. Michaelson's actions

---

[180](...continued)
white person," when Petitioner is, in fact, Hispanic and Officer McCormick was black.

[181] See Coble v. Quarterman, 496 F.3d 430, 438 (5th Cir. 2007) (finding trial counsel was not ineffective for failing to adequately prepare witnesses before putting the expert on the stand and that although trial counsel could have been "more effective," their failure to do so does not necessarily mean they were ineffective); see also Emery v. Johnson, 139 F.3d 191, 197 (5th Cir.1997) ("The Sixth Amendment does not guarantee criminal defendants the right to error-free representation.").

[182] At the evidentiary hearing, appellate counsel had Dr. Kronberger testify that he had specifically prepared an outline of questions for trial based on his previous experience as an expert which Petitioner's counsel was given but failed to utilize.  There is no evidence that any of the other experts prepared similar outlines and no specific contention that any of the other experts were similarly mishandled.  Rec. Vol. VI, pgs. 16-26.

fell below an objective standard of reasonableness and cites no prejudice from his participation. Nor does the record reflect any such instances, save the same failure to object to prejudicial evidence attributable to Mr. Jenkins.

### (6) Trial Court's Erroneous Admission of Prejudicial Evidence.

Closely related to Petitioner's ineffective assistance of counsel claims, Petitioner argues that the trial court failed to keep out erroneous and prejudicial evidence.  Because his trial counsel admitted that Petitioner shot Officer McCormick, Petitioner asserts that the admission of the following items was unnecessary and prejudicial: Mrs. McCormick's testimony, the autopsy photos, the officer's bloody shirt, the 911 tape, and the photographs of the officer's wedding and children.  In addition, Petitioner claims that the trial court erred in denying defense counsel's objection to the presence of uniformed officers in the courtroom.  In response, the state claims that this evidence was ruled admissible at trial, and that it was proper evidence because the state was required to prove its case beyond a reasonable doubt regardless of any stipulation in the defense's opening remarks about the shooting.  The state also claims that admissibility of evidence is an issue of state criminal procedure rather than federal constitutional rights.  These arguments were raised in Petitioner's application for post-conviction relief and were denied by the evidentiary hearing judge without analysis.

It is well-established that "[e]rrors of state law, including evidentiary errors, are not cognizable in habeas corpus."[183]  Even if evidence were improperly admitted, habeas relief for errors in a trial court's evidentiary ruling is warranted only if the admission of evidence was sufficiently arbitrary or prejudicial to result in a "denial of fundamental fairness" under the Due

---

[183] *Wood v. Quarterman*, 503 F.3d 408 (5th Cir. 2007) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992)).

Process Clause.[184]  Moreover, the erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.[185] "Assuming arguendo that the admission of [evidence] was constitutional error, [the] claim still fails [if the defendant] has not shown that the testimony had a 'substantial and injurious effect or influence in determining the jury's [ ] verdict.'"[186]

In this case, the admission of some of the above evidence was erroneous and, as discussed, prejudicial.  This is not true for all of the evidence, however, as the autopsy photographs and victim's clothing were likely admissible.[187]  Moreover, even in the instances in which the admitted evidence was prejudicial, Petitioner's trial counsel not only failed to object, but also stipulated to the admittance of Danine McCormick's testimony and the playing of the 911 tape – two of the most prejudicial pieces of evidence.  While trial courts have an obligation to protect the integrity of the trial process, the judge was not on notice that there was or would be anything inherently improper about Danine McCormick's testimony as both sides agreed to it.  Likewise, in light of defense counsel's complacency with the playing of the 911 tape, the judge may have assumed that Petitioner's counsel failed to object as part of a general strategy.  With every indication that defense counsel accounted for the prejudicial nature of the evidence and did not find it sufficiently worrisome to object, the Court cannot say that it was plain error for the trial judge to admit the unopposed testimony of Danine McCormick and 911 tape.

---

[184] *Janecka v. Cockrell*, 301 F.3d 316, 328-29 (5th Cir.2002) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)); *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998); *see also Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998).

[185] *Id.*

[186] *Wood*, 503 F.3d (citing *Janecka*, 301 F.3d at 328-29).

[187] Autopsy photographs are frequently admitted to corroborate evidence establishing cause of death, location, placement of wounds, etc. *State v. Nix*, 327 So. 2d 301 (La. 1975); *State v. Lee*, 569 So. 2d 1038 (La. Ct. App. 3d Cir. 1990); *State v. Condley*, 904 So. 2d 881 (La. Ct. App. 5th Cir. 2005).  Similarly, evidence such as the victim's clothing is usually admissible even if defense counsel is willing to stipulate to its existence and may be used to establish the extent of the injury.  *State v. Gilmore*, 332 So.2d 789 (La.1976); *State v. Sterling*, 377 So.2d 58 (La.1979); *State v. Manieri*, 378 So.2d 931 (La.1979); *State v. Deaton*, 412 So.2d 586 (La.1982).

In regards to Petitioner's claim that the trial judge improperly refused to exclude several uniformed officers from the courtroom during the trial, this Court finds that this argument is likewise without merit.  Due process requires courts to safeguard against "the intrusion of factors in the trial process that tend to subvert its purpose."[188]  In particular, courts must guard against the atmosphere in and around the courtroom becoming so hostile as to interfere with the trial process.[189]  The presence of uniformed officers in the courtroom is one factor of which judge's must be aware, and the failure of a trial judge to do so has resulted in reversal.[190]  In the case at hand, however, the trial judge noted that the number of officers present was fairly limited and that they were somewhat dispersed.[191]  Additionally, he did not indicate that they were particularly disruptive.  Based on these facts, the trial judge was not under a constitutional obligation to exclude the officers.[192]  Admittedly, the presence of such officers may have been a factor negatively contributing to the prejudicial atmosphere surrounding the trial.  Nevertheless, the number of officer's present was not so great as to "brand" Petitioner "with an unmistakable mark of guilt" or to have been a substantial factor in creating the unduly prejudicial atmosphere.[193]  As such, the trial court's decision denial of trial counsel's motion appears to be in accordance with established Supreme Court precedent.

---

[188] *Woods v. Dugger*, 923 F.2d 1454, 1457 (11th Cir. 1991)(quoting *Estes v. Texas*, 381 U.S. 532, 552, 85 S.Ct. 1628, 1637, 14 L.Ed.2d 543 (1965)(Warren, C.J., concurring)).

[189] *Id.*

[190] *Holbrook v. Flynn*, 475 U.S. at 567; *Woods*, 923 F.2d 1454.

[191] The judge noted no more than five or six officers in a courtroom with a capacity of ninety-six to one hundred people and went on to indicate that they were not all in the same place. Rec. Vol. V, Trial Transcript, pgs. 88-90.

[192] *Hill v. Ozmint*, 339 F.3d 187 (4 th Cir. 2003)(presence of six security officers, including bailiffs, five of whom were in uniform insufficient to create prejudice); *United States v. Elder*, 90 F.3d 1110, 1131 (6th Cir. 1996)(denying relief because the marshals "were spread around the courtroom"); *Bell v. True*, 413 F.Supp.2d 657 (W.D. Va. 2006)(denying relief and noting that in *Woods*, there were 45 uniformed guards in the courtroom, that many people in the small rural community in which the trial was taking place were employed or knew someone who worked at the prison where the guard was killed, and that the officer's family had a petition signed by five thousand individuals calling for the death penalty for murderers of prison guards).

[193] *Holbrook*, 475 U.S. at 571.

**(7)  Improper Translation of the Proceedings.**

Petitioner claims that the trial court failed to provide a proper English-Spanish translation of his trial in violation of his rights under the Louisiana Constitution and, ostensibly, under the United States Constitution.  In his application for post-conviction relief, Petitioner offered by affidavit evidence that the translator was silent during certain parts of the trial and that the translator spoke a dialect of Spanish that is apparently difficult for Mexicans to understand.[194] At the evidentiary hearing held in response to Petitioner's application for post-conviction relief, the hearing judge dismissed Petitioner's claims stating that "[Petitioner] had an interpreter at every setting ... and ... the Mexican Consulate was also involved in this case."[195]

Courts have widely recognized that where the accused does not understand or speak English well enough to adequately comprehend or participate in the proceedings, the defendant's rights to fundamental fairness and due process of law require that an interpreter be provided to translate between English and the defendant's own language.[196]

In this case, the record demonstrates that the trial judge took care to provide Petitioner with an interpreter at every stage.  Specifically, the record reflects that the trial judge signed an order on April 24, 1997, ordering the Indigent Defender Board to provide funds for Perez to retain a translator to assist him in the preparation of his defense.[197]  In addition, when Perez was transferred to the Feliciana Forensic Facility, the judge's order mandated that he be examined

---

[194] Rec. Vol. VI, Application for post-conviction relief, pgs. 48-49.

[195] *Id.*, at 45.

[196] See *Marino v. Ragen*, 332 U.S. 561, 68 S. Ct. 240, 92 L. Ed. 170 (1947); *Perovich v. United States*, 205 U.S. 86, 27 S. Ct. 456, 51 L. Ed. 722, 2 Alaska Fed. 750 (1907); *United States v. Martinez*, 616 F.2d 185, 188 (5th Cir.1980).

[197] Rec. Vol. II, p. 160.

and treated by a bilingual physician able to speak and understand English and Spanish.[198]  While

at Feliciana, a social worker translated the legal rights information provided to patients into

Spanish and gave a copy of the tape to Petitioner, who listened to it regularly.[199]  Although there

is no mention at the beginning of the trial transcript about the presence of an interpreter,

Petitioner admits that an interpreter was present at trial and the hearing judge who had presided

over Petitioner's trial specifically noted that Petitioner had an interpreter at all significant times.

Thus, Petitioner was not, in fact, denied an interpreter.[200]

The primary issue here is whether the translation provided was deficient.  Petitioner

argues that his trial interpreter "often sat silently while the judge and/or witnesses spoke in

English" and that "instead of providing a translation ... the interpreter often attempted to engage

[Petitioner] in informal conversation."  In this regard, it is significant that Petitioner made no

objection to the adequacy of his interpreter at trial.[201]  "Only if the defendant makes any

difficulty with the interpreter known to the court can the judge take corrective measures."[202]

Moreover, beyond his bare assertions, Petitioner does not offer any specific instances where the

translation was inaccurate or insufficient.  The fact that the translator spoke a Puerto Rican

dialect of Spanish which the Consulate indicated might be difficult to understand for a person

primarily familiar with the dialect of Spanish spoken in Mexico, does not mean Petitioner

himself could not understand the translator.  In fact, as Petitioner had lived in both Florida and

Texas for many years prior to the incident, he might well have been exposed to the dialect

---

[198] *Id.*, at 193

[199] *Id.*, at 173; State Rec. Vol. V, pgs. 224-25.

[200] Rec. Doc. I, p. 23.

[201] *Martinez*, 616 F.2d at 188 (indicating that a failure to object weighs against overturning a trial court's decision regarding an interpreter).  Although the Mexican Consulate sent a letter discussing its concerns regarding the adequacy of Petitioner's translator, neither Petitioner nor his attorney ever indicated that the translation was insufficient.

[202] *Valladares v. United States*, 871 F.2d 1564 (11th Cir. 1989).

spoken by his translator.  Petitioner also does not explain how the allegedly insufficient translations actually prejudiced his defense.[203]  Based on the information indicating that the trial court provided Petitioner with translators and in the absence of evidence establishing that Petitioner's translator was deficient, this Court cannot say that the state court's denial of Petitioner's claim was constitutionally improper.

### (8) Petitioner's Competence to Stand Trial

In his last assignment of error, Petitioner argues that he was not mentally competent at the time of trial.  Petitioner previously raised this issue in his application for post-conviction relief.  At the evidentiary hearing, the judge addressed the issue briefly and indicated that as he had also been the trial judge, he had fairly and thoroughly addressed the issue of Petitioner's competency prior to trial.[204]

It is a violation of due process to try and convict a defendant who lacks mental competence.[205]  The constitutional standard for competency is whether a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him."[206]  In order to ensure that a defendant is not tried or convicted while incompetent, states are required to conduct an inquiry into an accused's competence if the evidence raises a bona

---

[203]  He does not, for instance, indicate that he could have provided certain information to his counsel or the court which would have aided in his defense had it not been for the insufficient translator.

[204]  The judge stated that "[he] dealt with every second of what occurred and ... was the one who said that if we were going to err, let's err on the side of caution by sending him to get the treatment that he needed to get.  And [he] was the one who appointed all the psychiatrists and psychologists and dealt with it." Rec. Vol. VI, Evidentiary Hearing Transcript, p. 45.

[205]  *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Carter v. Johnson*, 131 F.3d 452, 459 (5th Cir.1997).

[206]  *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam).

fide doubt as to competency.[207]  If a trial court has conducted a hearing regarding a defendant's competency prior to making a ruling, the court's determination is a finding of fact entitled to the presumption of correctness.[208]  Habeas petitioner's claiming incompetence at the time of trial bear a "threshold burden of proof which must be satisfied before the habeas court has a duty to investigate the constitutional challenge further."[209]  This requires a showing that facts are sufficient to "positively, unequivocally, and clearly generate a real, substantial and legitimate doubt as to his mental competency at the time of trial."[210]

Petitioner utterly fails to meet his burden in this case.  Petitioner cites no facts or circumstances that would give rise to doubts about Petitioner's competency during his trial.  In fact, the record is replete with evidence supporting the inference that Petitioner was competent. As the Louisiana Fourth Circuit Court of Appeal mentioned, Dr. Ritter, Dr. Salcedo, Dr. Pena, and Dr. Carrington examined Perez for competency prior to trial, and Dr. Ritter and Dr. Salcedo wrote the trial court a letter stating that Perez was competent to proceed.[211]  At pre-trial motions, there were no motions by the defense claiming that Perez was incompetent to proceed to trial.[212] In fact, in opening remarks, the defense told the jury that Perez's treating physician, Dr. Carrington, would testify that Perez was medicated with Haldol so that he could be competent and go through with the trial.[213]  Dr. Ritter, stipulated as an expert in forensic psychiatry,

---

[207] *Holmes v. King*, 709 F.2d 965, 967 (5th Cir.1983)(citing Pate, 383 U.S. at 385).

[208] *Carter v. Johnson*, 110 F.3d 1098, 1106 (5 th Cir.1997).

[209] *Washington v. Johnson*, 90 F.3d 945, 950 (5th Cir. 1996)(citations omitted).

[210] *Carter,* 131 F.3d at 460 (citing *United States v. Williams*, 819 F.2d 605, 609 (5th Cir.1983)).

[211] Fourth Circuit Opinion, *State v. Perez*, 98-KA-1407, November 3, 1999, pgs. 29-30.

[212] Rec. Vol. V, Trial Transcript, pgs. 1-4.

[213] *Id.* at 19.

testified that he had examined Perez and found him competent to proceed.[214]  Dr. Salcedo, stipulated as an expert in forensic psychology, testified that he had examined Petitioner and found he was in remission, competent to proceed, understood the nature of the charges against him, and was able to assist his counsel in preparing a defense.[215]  Dr. Carrington, his treating psychiatrist at Feliciana Forensic Facility, where Petitioner was sent when found incompetent to proceed in August 1997, as well as afterward when Petitioner was returned to Orleans Parish Prison to await trial, testified that Petitioner was competent to proceed to trial.[216]  In closing arguments, the defense stated that while Petitioner had been incompetent prior to trial, he was placed on drugs at Feliciana Forensic Facility and became competent.[217]

As the Court previously found error in a jury unreasonably disregarding the unanimous opinion of Petitioner's experts, the Court refuses to now question a state court's reliance on the opinion of these same experts.  Thus, in light of the overwhelming expert testimony indicating that Petitioner was competent and the similar assertions made by defense counsel throughout his trial, the Court finds that Petitioner was not tried while he was incompetent in violation of his Constitutional rights.  Moreover, given how strongly the record supports the conclusion that Petitioner was competent, the Court finds no error in the state court's holding.  the record strongly substantiates that Petitioner was competent to stand trial.

## VIII.   CONCLUSION

Having considered the complaint, the record on direct appeal and for post conviction relief, and the applicable law, it is determined that Petitioner has demonstrated that his state conviction and sentence present grounds for the relief requested.  Accordingly, IT IS ORDERED

---

[214] *Id*. at 139.

[215] *Id.* at 163-4.

[216] Rec. Vol. V, Trial Transcript, pgs. 215, 220, 221, 224, 225, 228.

[217] *Id*. at 314, 316.

that the petition of SALVADOR PEREZ for writ of habeas corpus under 28 U.S.C. § 2254 is GRANTED.

IT IS FURTHERED ORDERED that the state either retry Salvador Perez within 120 days of this order or dismiss the charges. The state shall notify the defense and the Court of its intention within 30 days of this ruling.

New Orleans, Louisiana this 7th day of January, 2008.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE